SALMON et al. v. AUSTRO-AMERICAN STAVE & LUMBER CO., Limited.

(Circuit Court of Appeals, Second Circuit.  April 10, 1911.)

No. 188.

1. PRINCIPAL AND AGENT (§ 103*)—POWERS OF AGENT—IMPLIED AUTHORITY.

After correspondence between defendants, in New York, and plaintiff, which operated a sawmill in Louisiana for the manufacture of cottonwood lumber, with reference to the purchase by defendants of lumber to be cut by plaintiff during the ensuing season, defendants sent an agent to Louisiana, who signed an agreement in his own name for a contract to be drawn by defendants later, by which defendants were to purchase at stated prices all the better grades cut by plaintiff during the season, and to make monthly advances on the cut of the preceding month until the lumber was cured and shipped. It was further provided that defendants should also make monthly advances, by way of loan, on all the lower grade lumber cut by plaintiff, which was more than half the entire cut, the same to be repaid as plaintiff should sell and ship such lumber. *Held*, that the agent had no implied nor apparent authority to make a contract containing such an unusual provision, no such thing having been mentioned in the correspondence, and that in the absence of ratification the agreement was not binding on defendants.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 103.*]

2. PRINCIPAL AND AGENT (§ 170*)—UNAUTHORIZED CONTRACT OF AGENT—RATIFICATION.

In view of the fact that the so-called agreement was in the form of a letter from plaintiff to defendants, that it was signed by the agent individually, and provided for a formal contract to be drawn by defendants, a delay of five days after its receipt before answering it did not amount to a ratification.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 638–643; Dec. Dig. § 170.*]

In Error to the Circuit Court of the United States for the Eastern District of New York.

Action at law by the Austro-American Stave & Lumber Company, Limited, against Hamilton H. Salmon and another. Judgment for plaintiff, and defendants bring error. Reversed.

See, also, 179 Fed. 1021.

Charles J. McDermott (Bartow S. Weeks and Thomas G. Flaherty, of counsel), for plaintiffs in error.

Bernard G. Heyn (Henry L. Stimson, of counsel), for defendant in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

LACOMBE, Circuit Judge. The proof shows that the grades of millcut cottonwood lumber are four in number, box boards, firsts and seconds, selects, and box common; also that in cutting up the box common will be a little over one-half (in measurement) of the entire product. It is conceded in plaintiff's brief that of the total cut contemplated in the alleged contract the value of the combined quantities of the first three grades would be about $69,000 and the value of the box common would be about $40,000.

The paper which is relied upon as showing the terms of the alleged contract is in the form of a letter, dated Shreveport, La., April 26, 1904, addressed to defendants in New York, and signed by the manager of plaintiff's mill, who had authority to make contracts of sale. The Mr. Gott referred to in the letter was a representative of defendants who had come to Shreveport from New York in reference to the sale of plaintiff's 1904 cut. The important parts of the letter are as follows:

"We confirm herewith our verbal agreement made with your Mr. Harry J. Gott. We agree to sell to you and you agree to buy from us all the selects and the firsts and seconds and box boards contained in our cut of cottonwood lumber beginning from May 1, 1904 and ending Dec. 31, 1904, this cut to consist of the maximum of eight million feet in all. The prices will be as follows: $17 for selects, $20 for firsts and seconds, and $25 for box boards. These prices are for 1,000 feet board measure f. o. b. cars, Shreveport. Net cash. You will advance to us on each first of the month for the month previous on this contract $10 per 1,000 feet board measure on basis of log run mill cuts or No. 3 common cut. This advance to be made on the box common lumber which is not sold under this contract, in consideration of a rate of 6 per cent. interest, and on the other lumber, will say selects and better, the advance is made free of interest. The lumber is to be well manufactured and sawn * * * so as to be one inch thick when dry. The lumber is to be well piled by us in our mill yard. The advance of $10 per 1,000 feet board measure has to be based upon the measurement of our inspector as said lumber is sawn, after allowing 5 per cent. for shrinkage for drying. The payment is to be made in such a way that we will draw sight draft on you, attaching to the said draft a bill of sale for the lumber cut during the month. * * * All the lumber under this contract, selects and better, has to be shipped and paid for in full inside of six months after it is cut."

After provisions for revision of measurement, segregating, numbering, and marking each pile subject to advance, inspection, and loading on cars, the contract proceeds:

"The advance of $10 per 1,000 on box lumber which grade is not sold under this contract, has to be repaid to you according to shipments made at the end of the month, including the 6 per cent. interest less the difference in the price of the selects and better shipped out during the month. For instance, if we ship out 500,000 feet of box lumber during one month, we have to pay back to you at the end of the month $5,000 plus 6 per cent. interest on this $5,000. From this amount is to be deducted the difference between the $10 and the price agreed upon the selects and better shipped out during the said month. On account of the short time your Mr. Gott had to spend here, we leave it to you to draw up a contract under the terms mentioned in this letter, and we agree to sign and return it to you."

There is a sharp conflict of testimony as to what took place when this paper was drawn up; but, the verdict being for plaintiff, we must accept the narrative of Kobler, its manager. The writing embodied correctly the terms of an agreement between himself and Gott, it was

signed "The Austro-American Stave and Lumber Company," by Kobler, and Gott also signed with his own name, "H. J. Gott," in the presence of a witness who also signed. There was a carbon copy. Gott took the original away with him.

[1] The first question raised in the case was whether Gott had any authority, or any apparent authority, to enter ino this contract on behalf of the plaintiff. He was a young man of 27, sent down to Shreveport by defendants after some correspondence between them and the plaintiff. Examination of the alleged contract shows that it is a peculiar one. It provides for the sale, purchase, and delivery of lumber to be cut, which shall be of certain specified grades. It further provides for advances on account of the purchase price to be made from time to time as such lumber is cut, and also for measurement, inspection, shipping, etc. All these clauses are usual in contracts of this sort, and any one who had apparent authority from another person to purchase lumber for such other might very well be supposed to have authority to bargain as to those provisions, as to when advances should be made, in what amounts, etc. But this document contains other provisions which are certainly unusual. It requires the purchaser of the higher grades to make advances, not only on the monthly cut of such grades, but also on the monthly cut of the lower grade, which he had not agreed to buy. And this lower grade, as we have seen, is more than one-half of the total amount of lumber cut. In other words, at the end of each month the purchaser is to pay part of the purchase price of the lumber cut for him during that month, and is also to lend to the seller a sum of money, at the rate of $10 per 1,000 feet board measure for all box common lumber cut by the seller for his own use or to be sold by him to some one else. For this loan the seller is to pay interest at 6 per cent. until it is repaid. Moreover, the time of such repayment is left uncertain. The language is, "If we ship out 500,000 feet of box lumber (common) during one month we have to pay back to you at the end of the month $5,000 plus 6 per cent. interest," but there is no guarantee that 500,000 feet, or even one foot, will be "shipped out" in any particular month. If the seller were not able to find a purchaser for his box common month by month as it was cut, it would not be shipped out, and it would soon come to pass, that, besides paying advances on their own lumber, defendants would be loaning plaintiff many thousands of dollars to enable it to carry its lumber and to continue cutting more of it to sell to some one else.

We are clearly of the opinion that Gott's assent to this proposal cannot be held to bind defendants, unless the record discloses apparent authority to make some such unusual contract. His own declarations as to his own powers cannot, of course, prove his authority or even his apparent authority. Reference must be had to the statements of the principals who sent him to Shreveport as their agent. All that the record discloses is the following:

In October, 1903, defendants wrote to plaintiff asking what it manufactured and lowest cash prices. Reply was sent November 2, 1903, stating that it cut cottonwood, and giving a price. Defendants next

wrote March 17, 1904, asking if plaintiff was going to have any cottonwood lumber to offer that year, and also quantity and best prices. In reply plaintiff wrote:

"Our cut beginning May 1st is not sold yet. We are manufacturing about 1,000,000 feet a month. Before we quote you a price, we would ask whether you are willing to buy the whole cut, or only a limited quantity. We will then submit you our price for log run or on grades."

Defendants replied March 29, 1904, that the amount handled might depend on the price, etc., and asking for prices "both for log run, mill culls cut, and also on grades." Plaintiff replied April 1st, stating that it would sell its cut on the following conditions:

"Quantity subject to the stage of the Red river, but all we are able to cut from May 1st until December 30th, not exceeding 8,000,000 feet. Prices:

| | | |
|---|---|---|
| For Box Common | | $14.50 |
| " Selects | | 17.00 |
| " Firsts & Seconds | | 20.00 |
| " Box Boards | | 25.00 |

" *  *  * Payment, $10 per 1,000 at the end of each month as per mill scale. We to insure the lumber for four months; you to pay the balance at the rate of $450 at the expiration of four months, if the lumber is not shipped at this time. The further payment to be made when the cars are shipped. We would rather sell mill run, but this would complicate this affair, as you do not know what kind of logs we are cutting and sawing, but neither do we know in advance. But, if we sell on grades, there would be no controversy about the quality of the logs."

Defendants telegraphed April 11th, "Our representative will see you latter part of this month," and wrote April 12th:

"Our Mr. Harry T. Gott leaves here on the 20th—should reach your place about 25th or 26th—and we would like to leave the matter open until he gets there, and so that we can see your lumber, etc. In the meantime, will you kindly give us an idea of about the percentage of the different grades in your monthly cut, and also about what percentage of good lumber would run 6 and up 10 and up and 15 and up wide."

To this request plaintiff on April 15th replied:

"Regarding the way our lumber is running: This depends very much upon the quality of the logs we are sawing, and especially upon the stage of the river. If we have high water, as at present, we are able to bring our large logs down the river, which make a greater percentage of firsts and seconds than the smaller ones. *  *  * Since the first of February we have been able to bring down only some small logs, which give good box timber, but few selects and better. We think that, without making any guarantee, the lumber which we will saw from May 1st will run 35 per cent. and better selects and better. Balance box common."

This letter was received before Gott reached Shreveport. Except for his own statements, there was nothing other than the above correspondence and such inferences as might reasonably be drawn from it, to indicate what authority Gott had to enter into contracts for his principals. Assuming that there was sufficient to clothe him with apparent authority to make a binding contract on the lines indicated in the correspondence, or even with additional details such as are usually found in contracts for the purchase of lumber, we are satisfied that no reasonable construction of the correspondence would warrant the conclusion that Gott was apparently authorized to agree that his principals

should, besides making advances on their own lumber at $10 per 1,-000, loan several thousand dollars to the mill owner for an indefinite period in order to enable it to keep its mill going.

[2] The next question is whether the contract which Gott undertook to make was subsequently ratified by defendants. The alleged contract was signed and taken away by Gott on April 26th; but he delayed forwarding it to defendants until the 28th or 29th, when he mailed it in Memphis. It appears to have reached them May 2d or 3d. On May 7th (Saturday) they wrote to plaintiff:

"We are in receipt of your letter of the 26th ultimo through our Mr. Gott. [This *letter* is the alleged contract, which was in the form of a letter.] It only reached us the first of the week. We have not had time to go thoroughly through the form of contract that you wish to make with us, but we will write you fully on Monday regarding it. Would state, however, that there are some matters that will have to be changed before we can agree to this, especially in regard to payments of money on lumber sawn for other people, etc. * * * We will, however, do our best to offer you a contract agreeable to both sides."

Neither in this letter nor in any subsequent one is there an express ratification. It is contended, however, that defendants must be held to have ratified, because they did not disaffirm Gott's action promptly upon being informed of it. In view of the last clause in the alleged contract to the effect that "a contract under the terms mentioned in this letter" was to be drawn up, and of the fact that Gott signed his own name and not defendants', we think that it was not unreasonable to wait five days before sending the letter of May 7th. Plaintiff sent a notification, dated May 3d, that the cut of the day before was a certain number of feet. It was the receipt of this, probably on the 5th, that induced defendants to give the notice of May 7th, and we think their action was sufficiently prompt.

The judgment is reversed.