## COURSEY et al. v. FIRESTONE TIRE & RUBBER CO.*

Circuit Court of Appeals, Eighth Circuit.
May 18, 1929.

No. 7945.

James C. Kinsler, of Omaha, Neb. (Robert O. Reddish, of Alliance, Neb., and Fred A. Wright, of Omaha, Neb., on the brief), for plaintiffs in error.

P. E. Boslaugh, of Hastings, Neb. (B. M. Robinson, of Akron, Ohio, and J. W. Weingarten, of Omaha, Neb., on the brief), for defendant in error.

Before STONE and KENYON, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge. The first question to be determined in this case is whether W. B. Alexander, manager of the Omaha branch of the business of the Fire-

*Rehearing denied August 3, 1929.

stone Tire & Rubber Company, a corporation, had authority as the agent of said company to make the agreement sued upon. The trial court held that he did not have that authority and instructed the jury to return a verdict for the company. The Firestone Tire & Rubber Company at the time the alleged agreement was entered into was engaged in the manufacture and sale of automobile tubes and casings, with its manufacturing plant and principal place of business at Akron, in the state of Ohio. In the conduct of its business it had numerous branch houses located throughout the country. Harry P. Coursey and True Miller, partners, were engaged in the automobile and automobile tire and accessory business at Alliance, Neb. They alleged in their complaint that in September, 1919, an oral agreement was entered into between them and the defendant by its agent, W. B. Alexander; that the company by said agreement made and constituted them a distributing agency for its automobile tubes and casings and gave them the exclusive right to purchase the company's tubes and casings at 10 per cent. less than the company's preferred wholesale prices and to sell said products at defendant's wholesale prices to the trade within certain specified territory; that plaintiffs agreed to carry a sufficient stock of said products to supply the trade in their territory, not however at any one time to exceed the sum of $30,000 in value; that the company would employ and send out salesmen to sell plaintiffs' merchandise in the territory allotted to them; that the salesmen should pass upon the financial responsibility of all persons to whom sales were made and determine what credit should be allowed; that the salesmen should place the orders with the Firestone Company for merchandise to make up and replenish plaintiffs' stock; that plaintiffs would pay for all merchandise purchased from the company on or before the 10th of the month following date of shipment; that plaintiffs' customers should be required to make payment on or before the 10th of the month following date of shipment of goods sold to them; that plaintiffs' business would be conducted in accordance with the system of bookkeeping and accounting furnished by the company and under its supervision; that plaintiffs would make monthly reports to the company of all outstanding accounts; that upon the termination of the agreement plaintiff should have the right to return to the company all merchandise on hand for which the company would pay plaintiffs the current market prices; that plaintiffs should have the right to assign and deliver to the company all unpaid dealers' accounts, trade acceptances, notes and evidences of indebtedness which plaintiffs had or held for said merchandise sold in said territory by the plaintiffs as distributors or distributing agents for the company, and that the company would pay plaintiffs the full amount thereof; that the agreement was modified in January, 1920 (in respect to certain matters not necessary to be stated here); that the company's salesmen having theretofore overstocked plaintiffs, merchandise of the value of about $38,000 was by mutual agreement returned to the company in August, 1920; that on or about October 31, 1920, the agreement was terminated by mutual consent, at which time plaintiffs returned merchandise to the company of the value of about $3,000; and that at that time plaintiffs offered to turn over to the company all unpaid accounts, notes, trade acceptances and other evidences of indebtedness which plaintiffs had received from customers whose financial standing and credit had been passed upon and approved by the company's salesmen, and demanded that the company pay plaintiffs the face value thereof. It is alleged that the company refused to take over said unpaid accounts, notes, etc.; that said unpaid accounts, notes, etc., were worthless; and that by reason of the refusal of the company to accept and pay for said unpaid accounts, notes, etc., plaintiffs have been damaged in the sum of $26,-981.81. The defendant company, in its answer, in addition to certain matters affirmatively alleged, denied generally the allegations of plaintiffs' complaint.

It is not claimed that there was any evidence that W. B. Alexander, the manager of the Omaha branch of the company's business, had express authority to make the agreement alleged in the complaint and summarized above. The claim is that in view of the evidence it was for the jury to say whether or not he had apparent authority to make it in behalf of the defendant company. For this contention we find no support in the record. It appears from the testimony in the record that stocks of the company's products were maintained in warehouses at its several branches; that a manager was in charge of each branch and that he employed an office force and selling agents or salesmen to cover the territory allotted to his branch. Until plaintiffs became wholesalers of the company's products in a part of its territory as explained below, the Omaha branch dealt directly with the trade in all of the territory assigned to it, selling and delivering goods from the stock on hand in its warehouses at prices

fixed by the home office. On June 15, 1919, plaintiffs entered into a written agreement with the defendant company whereby they became wholesalers of the company's products in a part of the territory assigned to the Omaha branch. This agreement by its terms expired on the 31st day of August, 1919. After this agreement had been entered into one salesman employed and paid by plaintiffs and one employed and paid by the Omaha branch worked the territory assigned to plaintiffs by the agreement, taking orders for Firestone tubes and casings from the trade. These orders were sent to plaintiffs at their place of business in Alliance and filled by them from goods on hand ordered and received from the Omaha branch. The two salesmen above mentioned working in plaintiffs' territory during this period passed upon the financial responsibility of the trade, presumably from credit ratings furnished by the Omaha branch and from such other information as the salesmen were able to secure at the time. During this period plaintiffs made monthly reports to the company of their outstanding accounts. It appears that it was the understanding under the June agreement that some one from the Omaha branch would go out to Alliance and open a set of books suitable for plaintiffs' new business. This was in fact done shortly after the date of the alleged September agreement. Without going into details it may be stated generally that the only substantial difference in the conduct of plaintiffs' business from June 15 to August 31, 1919, confessedly under the June agreement, and from September, 1919, to and including January, 1920, allegedly under the September agreement, was that during the latter period the business was pushed with greater activity. During this latter period plaintiffs' salesman was taken off the road and placed in charge of the business at Alliance. The Omaha branch furnished two and for a time three salesmen who worked plaintiffs' territory and took orders for plaintiffs on May acceptances, making an intensive campaign until some time in January. In January plaintiffs were transferred from the Omaha branch to the Denver branch. After this change the business of plaintiffs was conducted substantially as it had been conducted during the previous summer. One of the modifications of the agreement alleged to have been made at this time was that thereafter the company should furnish only one salesman instead of two to work in plaintiffs' territory.

From a review of the dealings between the Omaha branch and plaintiffs, it is clear that W. B. Alexander, the manager of the Omaha branch, was in respect to this particular business the general agent of the Firestone Company; that is, he was the general agent of the company to sell and deliver its products in his territory to wholesale and retail dealers, as the case might be, with implied authority to extend credit and make collections. There is no evidence in the record that he or any other branch manager, or any other agent of the company for that matter, had ever at any time made or attempted to make with any dealer handling the company's products an agreement in behalf of the company stipulating that the company at the termination of the agreement would take back all outstanding accounts of the dealer and pay the face value thereof, or that it would at the termination of the agreement take back all goods remaining on hand and pay the dealer their market price. The only evidence in the record of an admitted wholesaler's agreement is of the one between the company and plaintiffs themselves bearing date June 15, 1919, above mentioned. This agreement was in writing and executed in behalf of the company by its sales manager, E. W. Be Saw, at the home office in Akron, Ohio. Instead of making plaintiffs selling agents of the company, which the agreement sued upon does in practical result, the June agreement contained this provision:

"It is understood and agreed that this contract is not to be construed as constituting the dealer an agent of the company for any purpose whatsoever."

The June agreement was negotiated by B. W. Elgin, a salesman working under Alexander, manager of the Omaha branch. He was sent to Alliance by Alexander for the purpose of negotiating the agreement. He carried with him printed or typewritten forms of agreement containing blank spaces for names, dates and other like matters. This June agreement was executed by plaintiffs in triplicate and was carried away by Elgin for execution by the company. In respect to its execution by the company, it contained this provision:

"The contract between the parties hereto is fully set forth in this agreement and has been entered into under the inducements and representations herein expressed and no others, and shall become effective only when executed by the duly authorized representative of the company at Akron, Ohio." Not only were plaintiffs when they signed this agreement then and there advised that the wholesale dealer's agreement to be effective must be executed by "the duly authorized representa-

tive of the company at Akron, Ohio," but they were also advised by another provision of the agreement that no one outside of Akron, Ohio, had authority to alter or modify its terms. This provision recited:

"It is further understood and agreed that the terms of this agreement cannot be altered, waived or modified, except by a written endorsement thereon executed on behalf of the company at Akron, Ohio, and that any separate verbal or written agreements which may be made between the dealer and the company's salesmen or other employés are not binding upon the company."

In the face of these provisions 'of the June agreement and the manner of its negotiation and execution by the company there is no just ground for the contention that the company had clothed Alexander with apparent authority or had held him out as possessing authority to make the September agreement alleged in the complaint. And certainly in the face of these provisions of the June agreement no such authority could be implied from his position as manager of the Omaha branch. It seems clear to us on this record that Alexander as manager of the Omaha branch had no apparent authority to bind the company to take back and pay for goods which he had sold to plaintiffs in the course of his employment or to take over and pay plaintiffs the face value of their outstanding accounts, etc. The fact that goods were taken back and plaintiffs given credit for their value in the adjustment and settlement of plaintiffs' account with the company or that goods were taken back and their value credited to plaintiffs and applied on subsequent purchases of other goods in no way militates against this conclusion.

The court in Richmond Guano Co. v. E. I. Du Pont de Nemours & Co. (C. C. A.) 284 F. 803, states the rule applicable here as follows: "The act of an agent within the apparent, but not within the real scope of his authority, is binding on the principal where loss would otherwise result to one who has in good faith relied on such apparent authority. And an act is within the apparent scope of an agent's authority when a reasonably prudent person having knowledge of the usages of the business, is justified in supposing that he is authorized to perform it from the character of the known duties.",

In Schuster v. North American Hotel Co., 106 Neb. 672, 184 N. W. 136, it is said: "A person dealing with one known to be an agent is held to the exercise of reasonable prudence, and, if an agent makes an agreement, representation or promise so unusual and unrea-

sonable as to arouse the suspicion of a man of ordinary or average business prudence, he is put upon notice and must ascertain if actual authority has been conferred."

In Hill v. James, 148 Minn. 261, 181 N. W. 577, the court said: "If the agent, even though a general one, tenders a contract so unusual as to arouse the inquiry of a man of average business prudence, the person to whom the contract is tendered is put upon notice, and must ascertain if actual authority to enter into it has been conferred."

In Friedman & Sons v. Kelly, 126 Mo. App. 279, 102 S. W. 1066, the court said: "As a correlative of the principle which affixes the limitation of the rule with respect to the apparent authority of an agent, as above indicated, there is another and companion principle which enforces a reasonable degree of diligence upon those who deal with the agent in relying upon his apparent rather than this express authority to bind the principal; and that is the person dealing with the agent, although ever so innocent, will not be permitted to ignore all the precepts of common sense pointing contrariwise and rely exclusively upon the representations or promises of the agent, however unreasonable, for the law with respect to every relation of life not involving intentional fraud or malice, as we understand it, sets up an ordinarily prudent man as the standard by which the conduct and affairs of other men should be governed, and in consonance with this standard a person dealing with an agent is required to act with ordinary prudence and reasonable diligence."

As bearing upon the rule, see, also, the following cases: Richardson & Son v. Studebaker Corp. of America, 29 Ga. App. 249, 114 S. E. 648; Owens Bottle-Mach. Co. v. Kanawha Banking & Trust Co. (C. C. A.) 259 F. 838; Salmon v. Austro-American Stave & Lumber Co. (C. C. A.) 187 F. 564; Chicago, R. I. & P. R. Co. v. Chickasha National Bank (C. C. A.) 174 F. 923.

It seems to be faintly suggestive in plaintiffs' brief that the company ratified the alleged September agreement, but the record does not contain any evidence of ratification by an authorized agent of the company. The agents and employees of the company who according to the testimony of plaintiffs' witnesses promised plaintiffs that the company would carry out the alleged September agreement by taking over and paying the face value of the outstanding accounts, etc., due and owing plaintiffs at the termination of the alleged agreement, had no greater au-

thority in respect to ratifying it than Alexander had in respect to making it.

In our opinion plaintiffs failed to show that Alexander had any authority, apparent or otherwise, to make in behalf of the defendant company the alleged agreement sued upon. The trial court therefore did not err in directing a verdict for the defendant. This conclusion disposes of the case and renders it unnecessary to consider other questions discussed by counsel in their briefs.

The judgment should be affirmed; and it is so ordered.