# QUEVLI FARMS, INC. v. VINNIE H. CONNER AND OTHERS.[1]

March 22, 1929.

No. 26,775.

[1]Reported in 224 N. W. 264.

See note in 46 A. L. R. 322.

*Nels Quevli* and *Meighen, Knudson & Sturtz,* for appellants.

*D. F. Nordstrom* and *Catherwood, Hughes & Alderson,* for Great Northern State Bank, respondent.

WILSON, C. J.

Plaintiff and defendant Lakefield Farm Credit Company appealed from an order denying plaintiff's motion for a new trial.

The action is to quiet title. Anna McGuire Quevli on July 8, 1920, owned 600 acres of land in Freeborn county. It was subject to what we will term the "first group" of mortgages for $15,200, $4,800, $2,000, and $3,000; total $25.000, covering 560 acres, 280 acres, 130 acres and 160 acres, respectively. A 40-acre tract was wholly omitted. On the date mentioned the owner conveyed this land so mortgaged to E. E. Conner, the mortgages being deducted as a part of the purchase price. The grantee gave to grantor a "second group" of mortgages upon all the land for $15,000 on 320 acres, $5,000 on 120 acres, $5,000 on 160 acres; total $25,000. The deed and "second group" of mortgages were all recorded on July 22, 1920, the "first group" having been previously recorded.

Each of the mortgages in the "second group" contained a replacement clause giving the mortgagor the right to have the mortgage discharged of record to permit the renewal of the mortgages in the "first group" or any part thereof or to replace any or all of such mortgages by another mortgage or mortgages, not for a greater

amount, and requiring the owner to secure the indebtedness secured by the "second group" of mortgages by new mortgages to be recorded junior and inferior only to such mortgages so replacing the amount of the "first group."

Default was made in the payment of interest on each of the mortgages in the "second group." They were foreclosed by advertisement. The notice of the foreclosure sale was in each instance signed by the mortgagee personally. Her husband, Nels Quevli, is a lawyer. He prepared the notices for the foreclosures and made the usual affidavit as to costs and disbursements. No amount is included anywhere for attorney's fees. Each of the three foreclosure sales was held December 29, 1924.

The mortgage of $15,200 was paid by Conner, and a satisfaction was made and delivered on October 22, 1920, but it was not recorded.

The mortgage of $4,800 was assigned to Conner in blank March 12, 1921, and on January 5, 1925, the name of the Great Northern State Bank of St. Paul was inserted as assignee.

In June, 1922, Conner procured an assignment in blank of the $2,000 mortgage. On January 5, 1925, the name of the same bank was inserted as assignee.

Under date of December 22, 1920, Conner procured an assignment of the $3,000 mortgage in blank wherein the name of the same bank was written as assignee about January 5, 1925.

Under date of January 5, 1925, Conner borrowed $27,000 from said bank, a defendant herein and now in custody of the commissioner of banks, of which Conner was then president. This was a new loan. On May 14, 1925, four mortgages to secure the loan from Conner to the bank were recorded covering the 600 acres, not 560 as the first group, and divided as follows: $8,000 on 160 acres, $8,000 on another 160 acres, $7,000 on another 160 acres, and $4,000 on 120 acres. This is the "third group." As far as the bank records show these mortgages were the sole security for the $27,000 loan. The satisfaction and assignments concerning the "first group" of mortgages were never entered upon the records of the bank as assets. Conner died September 26, 1925, and the bank closed its doors December 28, 1926.

The bank claims that the mortgages in the "third group" were given in place of the mortgages in the "first group."

No request was ever made by Conner or anyone else to have any of the "second group" of mortgages released or satisfied of record to permit the renewal or replacement of any of the "first group."

After the foreclosure of the "second group" of mortgages the certificates of sale were assigned by Mrs. Quevli, the purchaser, to the Lakefield Farm Credit Company and thereafter to plaintiff. Upon the expiration of the year for redemption plaintiff went into possession. There was no redemption.

This action is to clear away the clouds on the title resulting from the "first group" of mortgages not being satisfied upon the record, and to clear away the claims of the bank under the "third group" of mortgages, which plaintiff claims are cut off by the foreclosures.

The court canceled the certificates of foreclosure and held the "third group" of mortgages superior to the "second group."

■ The claim that the foreclosure of the "second group" of mortgages is a nullity is grounded on the fact that Nels Quevli, the lawyer-husband, did not have on record the statutory power of attorney authorizing him to foreclose the mortgages as required by G. S. 1923, § 9606. It is conceded that Mr. Quevli participated in and rendered the services of a lawyer to his wife in connection with the foreclosure proceedings. He prepared the notices, made the affidavit of costs and disbursements, and presumably prepared the foreclosure records as finally recorded.

Mrs. Quevli, the mortgagee, signed the notices of sale personally. In the absence of a power of attorney the mortgagee is the only one who has power to give the foreclosure notice. This she did. Had the notices been signed by the attorney, a power of attorney would have been essential. The notices do not carry his name as her attorney. Indeed his name nowhere appears except in the affidavit in each case. But the sale is complete without the affidavit. Johnson v. Cocks, 37 Minn. 530, 35 N. W. 436; Johnson v. N. W. L. & B. Assn. 60 Minn. 393, 62 N. W. 381; Farnsworth L. & R. Co. v. Commonwealth T. I. & T. Co. 84 Minn. 62, 86 N. W. 877. The mortgagee had a right to foreclose her own mortgages. She had a right

to get help if necessary or if she chose to do so. She could legally get the necessary help from anyone who was willing to help her. We know of no reason why she could not properly get the necessary assistance from a lawyer. The attorney's (husband's) help was a gratuity. His help did not destroy the fact that the notice, the important thing, was her act and that the foreclosure was in law hers. No attorney's fees were included or charged as an item of expense. The mortgagor was not harmed. No one was prejudiced. The mortgagee intended to foreclose, as she had a right to do.

This is not the kind of a case that the legislature had in mind when it passed G. S. 1923, § 9606, requiring that when an attorney is employed to conduct a mortgage foreclosure his authority should be in writing and recorded. The purpose was to prevent unauthorized foreclosures and perhaps unnecessary burdens upon the debtor as well as to protect the mortgagor and subsequent lienholders. Peaslee v. Ridgway, 82 Minn. 288, 84 N. W. 1024. No such elements are in this case. The penalty sought to be imposed is unduly harsh and is unjust. It cannot be supported by reason or principle. How would the mortgagor have been served if the power of attorney had been given and recorded and Mr. Quevli had collected the statutory attorney's fee? The case of Peaslee v. Ridgway, 82 Minn. 288, 84 N. W. 1024, does not hold to the contrary. Indeed under the circumstances here disclosed the lawyer-husband was not "employed to conduct such foreclosure" within the meaning of G. S. 1923, § 9606. We reach the conclusion that the foreclosure proceeding in relation to the "second group" of mortgages is valid, the titles resting thereon are sustained, and the finding that a $20,000 mortgage and a $2,000 mortgage given by the plaintiff are void is reversed.

The right of replacement of mortgages in the "first group" as embraced in the "second group" was the right to give another mortgage or mortgages for the same amount supposedly for the purpose of paying the existing mortgages included in the "first group." Perhaps it meant the right to renew the existing mortgages plus the alternative right to borrow from others on mortgages to pay the existing mortgages. The language of the agreement says "whenever" the mortgagor or his grantee may desire they shall have the

right. But of course there is some limit as to when this may be done, and doubtless the first limitation is that it must be done while the mortgages of the "first group" are still in existence. The mortgage for $15,200 was paid in October, 1920. A satisfaction authorizing the discharge upon the record was delivered. The mortgage was extinguished. It no longer existed. It was no longer susceptible of replacement. The right or privilege which once existed had been voluntarily terminated. When the "third group" of mortgages were given there was no $15,200 mortgage to be replaced. To the extent of this mortgage the findings of the trial court cannot be sustained.

As to the three mortgages of the "first group" concerning which Conner procured assignments in blank, Conner apparently disregarded the mortgagee in the "second group." He increased the indebtedness $2,000. He divided the new mortgages differently. He did not solicit the co-operation of the mortgagee in the second group. But upon the trial of the case the bank reduced its claim under the $4,000 in the "third group" to $2,000. However the court found that the "third group" of mortgages were given to replace the "first group" and were prior to the "second group" within the spirit of the replacement clause. But we need not discuss the evidence in the case tending to support the court's finding in relation to the three mortgages. Legal obstacles seem to be in the way of sustaining the result.

The "second group" were foreclosed on December 29, 1924. The mortgagee bid the lands in for the full amount of the mortgage indebtedness. This extinguished the mortgage debts. The sale also exhausted the lien and power of sale under the mortgages. 4 Dunnell, Minn. Dig. (2 ed.) §§ 6313, 6314. Thereafter the mortgages became, as security, functus officio, and their only future offices were as muniments of title. Where the mortgagor fails to redeem after foreclosure the rights of the parties are to be measured, not by anything in the mortgage—except as muniments of title—but by statute. Pioneer S. & L. Co. v. Farnham, 50 Minn. 315, 52 N. W. 897; Winne v. Lahart, 155 Minn. 307, 193 N. W. 587, 34 A. L. R. 844.

Mr. Conner stood by and permitted this to be done. It was possible only because of his default. He did not protect his rights by keeping his covenants to pay. When the "second group" of mortgages passed out of existence by the foreclosures he lost his privileges under the replacement clauses. Indeed his rights thereunder were thereby cut off by operation of law. It follows that when the "third group" of mortgages were given on January 5, 1925, they were subordinate to the "second group." The bank did not redeem from the foreclosure sale which destroyed the title mortgaged to it by the "third group" of mortgages given by Conner.

However the three mortgages so assigned were taken from the holders by Mr. Conner's paying them their money. He took the assignments and not satisfactions. It is established by the finding of the trial court that he took the assignments for the purpose of keeping the mortgages separate from his fee in the land in order to effectuate a replacement. Indeed the use of the replacement clause in the "second group" of mortgages is the only possible reason to support an intention on his part of such character as to avoid a merger. Conner did not assume the payment of the "first group" of mortgages, but he had received credit for the amount of these mortgages upon the purchase price of the land and they were debts against his land. The mortgagees therein were looking to his land for payment. Duty required him to pay for the protection of his land, which was primarily liable therefor.

The old technical rule of law was that a merger always takes place when a greater estate and a lesser estate coincide and meet in the same right in the same person. But the modern rule is that the question of merger is one of intention. Flanigan v. Sable, 44 Minn. 417, 46 N. W. 854. Granting that Conner's intention was to avail himself of the replacement clause, we have seen that by operation of law, flowing from his own conduct, he lost that opportunity. The result is that Conner after the foreclosure sale and prior to January 5, 1925, was in possession of the assignments in blank. He had held some of them for a long time. He had given the mortgagees their money. He had the right to insert a name in the assignments as assignee. The assignments evidenced his property.

He was in control thereof and he had paid. His stated intention having become futile, it follows that he simply owned the mortgages so assigned. He was the man to pay, and he was the man to receive. The owner of the land owned the mortgage liens against it. This must be so because the only contrary purpose had failed. The actual intention having become impossible, the facts unhampered by such intention must stand upon their own merit and by operation of law a merger took place. The facts speak for themselves. This union of ownership of land and mortgages by operation of law extinguished the mortgage lien by being consolidated with the fee. There was a merger. 40 C. J. 650; 25 C. J. 230; 10 R. C. L. 666; 20 Am. & Eng. Enc. Law (2 ed.) 588, 1064; 46 A. L. R. 322, Anno. The bank stands in Conner's shoes.

The order is reversed with directions to make findings in accordance with the views herein expressed by clearing from the records the "first group" of mortgages and the "third group" of mortgages, by recognizing the integrity of the $20,000 mortgage and the $2,000 mortgage mentioned in the findings, and by giving plaintiff the relief sought by the action.

Reversed.

STONE, J. (dissenting).

Our statute, G. S. 1923, § 9606, provides that "whenever an attorney at law is employed to conduct" a foreclosure of a real estate mortgage by advertisement "his authority shall appear by power of attorney * * * recorded prior to the sale." Differ as we may about the purpose of the statute, there is scant reason for denying it effect upon any foreclosure by advertisement "whenever an attorney at law is employed to conduct such foreclosure." In this case there is no attempt to deny that Mrs. Quevli employed her lawyer-husband as her attorney to conduct the foreclosure or that he did so under such employment. On this phase of the case therefore I dissent simply because I think the decision denies the statute its intended effect upon the untenable ground that, although an attorney was employed to conduct the foreclosure and did so, his services were gratuitous.

Upon the other phases of the case I agree with the opinion of the majority, except possibly as to the so-called replacement provisions in the mortgages of the second group. I question whether they were sufficiently definite to be enforceable in any event.

HILTON, J. (dissenting).

I am constrained to the view that there should be an affirmance. The foreclosure certificates were properly canceled by the trial court. Quevli testified that he acted for Mrs. Quevli as her attorney in the foreclosures "from the beginning of the foreclosures until they were completed and sales held." In his affidavit as to the disbursements in the foreclosure proceedings, he stated "that he is attorney for Anna McGuire Quevli." The circumstance that he did not include an item for attorney's fees in the list of disbursements is of no particular moment. Fees under such circumstances were not necessary to constitute his employment as her attorney to foreclose the mortgages within the provisions of G. S. 1923, § 9606. He prepared the notices of foreclosure (all she did was to sign them). Everything else was done by him. I think there was an employment under G. S. 1923, § 9606. The salutary purpose of the statute, I believe, is not being carried out by the majority holding.

The determination of the trial court, that to the extent of $25,000 the third group should be first liens upon the land, is in accord with the terms of the replacement provisions. What the parties intended is manifest; it was an arrangement of benefit to both. By the exercise of them, Conner would secure additional time in which to relieve his land of the first burden of indebtedness and, when carried out, the Quevlis would be released of personal liability on the first group notes; they were so released although Conner had not assumed payment thereof. There was no time limit fixed in which Conner must avail himself of its provisions. Such replacement was to be had "whenever the mortgagor * * * desires." I think that he acted within a reasonable time considering the facts disclosed by the record. After giving to Mrs. Quevli the second group mortgages, Conner repeatedly endeavored to secure loans with which to take up the first group mortgages. The Quevlis had

knowledge of this. Conner's efforts were unavailing until he finally effected a loan from defendant bank, of which he was president. Under the agreement, Conner had a right to renew the first group mortgages or of executing a new mortgage or mortgages to take their places; in either event, such renewals or new mortgages were to have preference over the mortgages in the second group. In order to accomplish this purpose by a new mortgage or mortgages, it would be necessary for Conner to pay up the first mortgages; this he did, the bank accepting the third group mortgages, relying, without question, as it had the right to do, on the replacement provisions. Those who succeeded to the Quevli interests in the second group mortgages took them subject to the replacement provisions. There was no requirement therein that the third group should correspond in individual amounts with those in the first group; there might have been only one new mortgage. The only limitation was that the total should not exceed $25,000. The evidence clearly shows that Conner's purpose and intention was to exercise the replacement clause privileges. It was not necessary to make a request for the replacement; it would have been futile. The lower court in permitting such replacement properly carried out the intention of the parties and accomplished exactly what they intended should be done.

The rule stated by the majority relative to the effect of the acceptance of a satisfaction of a mortgage is of course sound as a general proposition. In my opinion it does not apply to the situation here nor was there a merger as to the assigned mortgages contrary to Conner's intention and against his interest. Converse v. Jenson, 158 Minn. 209, 197 N. W. 490, and cases cited; 10 R. C. L. 666; 99 A. S. R. 170, note; 2 Jones, Mortgages (8 ed.) p. 508, § 1080, et seq. The $15,200 mortgage, as well as the three mortgages of which Conner secured assignments, should be replaced by the third group mortgages.