JOSEPH EDWARD MULLIGAN v. FARMERS NATIONAL BANK IN ALEXANDRIA.[1]

May 10, 1935.

No. 30,285.

[1]Reported in 260 N. W. 630.

452

 

*Chester W. Johnson* and *Dan J. O'Connell,* for appellant.
*Boutelle, Bowen & Flanagan* and *James I. Best,* for respondent.

STONE, JUSTICE.

After verdict for plaintiff, defendant's motion for judgment notwithstanding or, alternatively, for a new trial was denied, and it appeals from the order.

Defendant was incorporated late in 1925 for the purpose of taking over the business of its predecessor, the Farmers National Bank of Alexandria, at the city of Alexandria, in Douglas county. Following example of counsel, we shall refer to the latter as the "of" bank, and to defendant as the "in" bank where not otherwise designated. The contract evidencing the transaction whereby one succeeded the other is much referred to in testimony and argument but is not in evidence. It does appear that defendant assumed all deposit liabilities of its predecessor and that it took over its assets insofar as good banking practice permitted.

For long before September 20, 1928, there had been pending in Arkansas litigation in which J. T. Flanagan and others sought to recover a considerable sum under a contract for the excavation of a drainage ditch. That litigation has a long history which need not be here narrated. Neither is it necessary to determine whether Flanagan's interest was that of an actual party plaintiff, a lienor, or an assignee. He had the interest, and it was substantial. February 10, 1928, defendant took from him an assignment of all his "right, title and interest in and to the said decree [of the trial court in Arkansas] and to any money or property that I [Flanagan] may be entitled to under the terms of the said decree." Such negotiations were had between Flanagan and Dr. Volker, president of defendant, that the assignment from Flanagan, which had been taken to secure his indebtedness to defendant hereinafter mentioned,

was supplemented by a new contract, the terms of which were agreed upon between Flanagan and Volker September 20, 1928. That contract was in part oral and in part written. The written part is in evidence as plaintiff's exhibit Q and reads thus:

"It is hereby agreed and understood that the Farmers National Bank will allow J. T. Flanagan 20% of the net proceeds to be derived from the Harding Construction Company judgment. But that in no event, is this amount to be more than $2,000.00; and it is further understood and agreed that 25% of the amount to be derived by J. T. Flanagan will be paid in cash and 75% of the amount derived will be applied as payment on the J. T. Flanagan Real Estate Notes held by the Farmers National Bank.

*"Flanagan to be given 50% of any other money he may be able to collect from $3,500.00 retained by drainage dist. and Farmers Nat. Bk. to get bal.*

"Dated at Alexandria, Minnesota, September 20, 1928."

The first paragraph is in typewriting; the second, italicized above, in the handwriting of Dr. Volker. The transaction took place in the banking house of defendant at Alexandria. As far as the contract, of which the writing was only a part, rests in parol, we must treat the testimony concerning it as favorably to plaintiff as its purport permits. Exhibit Q was unsigned, but its genuineness is not questioned.

At this point it should be explained that defendant was creditor of other parties expecting to get money out of the Arkansas litigation. Defendant had attached their rights by effective garnishment. The money not going to Flanagan or for his account under exhibit Q was to be applied by defendant on its claims against debtors other than Flanagan.

The record supports the jury's conclusion that of the proceeds expected from the "Harding Construction Company judgment" defendant had received $9,613.21 on account of the first and main item referred to in exhibit Q and $3,688.19 on account of the second item, "$3,500.00 retained by drainage district." Of the first sum Flanagan was to receive 20 per cent not exceeding $2,000, and of the

second sum, 50 per cent. The provision that 75 per cent of the proceeds of the first item "will be applied as payment" on certain notes of Flanagan is out of the case, as will hereafter appear. Those notes are no longer obligations against Flanagan.

Flanagan's claim was assigned to plaintiff before the commencement of the action. The complaint declares for money had and received by defendant for account of Flanagan. But as the trial progressed the action became properly one on the express contract, part of which is evidenced by exhibit Q.

■ Defendant has argued much of plaintiff's supposed failure to show that defendant, rather than the "of" bank, was the party contracting with Flanagan and the actual receiver of the money subject to exhibit Q. Aside from any inference to be drawn from defendant's having taken over all deposit liabilities and all the good assets of its predecessor, the record contains enough evidence to support the jury's finding against defendant on that point. There is much of correspondence properly construed as an admission by defendant that it was the contracting party. We do not overlook testimonial denial by Dr. Volker of his authority to act for defendant. But he certainly appeared all through to be so acting. Nobody else took part in the transaction for either bank. Volker had been president of the "of" bank and continued as president of the "in" bank. He was an active representative of both. The transactions between Flanagan and Volker were all by correspondence or between the two gentlemen face to face in the banking house formerly that of the "of" bank and later that of defendant. Defendant took the assignment of Flanagan's interest, already mentioned, which was forerunner of the contract pursuant to which exhibit Q was delivered. Many of Dr. Volker's letters to Flanagan appear to be those of defendant rather than its predecessor. Whatever his actual authority, no word was given Flanagan by defendant to indicate that it was restricted. From beginning to end, Volker handled the whole thing for both banks, if both were interested. Under the circumstances, it is too late for defendant to deny, at least as against the contrary determination of the jury, that Volker had authority to act for it. If there was no express authority, there was at least an agency by

estoppel or holding out under familiar principles of the law of agency.

Defendant, with no impropriety, took much precaution to make it appear that "The Farmers National Bank" was a continuing institution, with no interruption or change of management. The "in" bank took over the business, apparently with as little publicity as possible, and continued it as though nothing had happened. It paid all outstanding checks on the "of" bank as presented, precisely as if drawn on itself. That was doubtless commendable procedure, but not without obvious implications adverse to defendant's claim that Dr. Volker had no authority to act for it in dealing with a customer or debtor whose relationship with the old continued with the new bank. What is called the apparent power of an agent is to be determined by the conduct of the principal rather than by that of the agent. "All of the elements of estoppel must be present." Dispatch Printing Co. v. National Bank of Commerce, 115 Minn. 157, 162, 132 N. W. 2, 4. The evidence reasonably supports the view that the management of defendant was such as to make it appear that Dr. Volker had the authority to act for it, which apparently he was exercising all along. It is unquestioned that Flanagan acted upon the assumption that he had such authority. Much of the business was done across the desk of defendant's president in its banking office. There was so much of it and in such matrix of circumstance that it is too late for defendant effectively to deny that the authority of its president was what it reasonably appeared to Flanagan.

■ It is argued for defendant that there was failure of consideration, on Flanagan's part, for the contract of September 20, 1928, partially integrated by exhibit Q. The claim is that Flanagan then agreed to dismiss an appeal then pending in the Arkansas litigation and that he failed to do so. On the day the contract was made he both wired and wrote his Arkansas counsel to "withdraw my appeal" in the case in question. That summary action could not be taken because too many other litigants were interested. But at this point the testimony of Flanagan must control. It is that the agreement, partially evidenced by exhibit Q, was the result of a conversation had in defendant's office at Alexandria with Dr. Volker wherein

he had expressed emphatic dissatisfaction with the manner in which the bank had been handling "my claim," already assigned to the bank as security. He threatened, so he says, to "sue them for the full amount of the claim" or that he "would intervene and tie up the proceedings." The matter was then compromised, and Flanagan given exhibit Q. He did not sue the bank, did not further intervene in the Arkansas litigation, nor do anything to "tie up the proceedings." He did all he could to comply with what he says his agreement was. In short, he was asserting a claim against defendant and threatening legal proceedings to enforce it. His testimony is that he forebore such proceedings on his own behalf on the faith of the contract of compromise. If so, he was asserting in good faith and on reasonable grounds a claim which was properly the subject of such a contract of compromise as he entered into. Montgomery v. Grenier, 117 Minn. 416, 136 N. W. 9.

Nothing more need be said about the merits. A fact issue was presented, which was finally disposed of by the verdict, which has adequate support in the evidence.

■ In September, 1928, when exhibit Q was given Flanagan, he was indebted to defendant in a sum upwards of $9,000 evidenced by two notes, one for $5,000 and the other for $4,000. These notes were secured respectively by first and second mortgages on Flanagan's homestead. Afterwards the bank foreclosed the second mortgage. There being no redemption, it took title in fee. Thereafter it sold the property back to Mrs. Flanagan for upwards of $6,000 and surrendered to her husband the old notes secured by the original mortgages. The record does not disclose by what kind of a deed it conveyed to her. It took back a new mortgage for part of the purchase price. There is no suggestion that the conveyance was subject to the original first mortgage. The conclusion is inescapable that defendant's equitable title or lien under the first mortgage was merged in the fee which defendant got by foreclosure of the second mortgage, and the debt thereby discharged. In such case the senior mortgage will "merge in the fee, and the debt which it secures will be extinguished." 2 Jones, Mortgages, (8 ed.) § 1107, citing Belleville Sav. Bank v. Reis, 136 Ill. 242, 26 N. E. 646, 647.

There it was held that under such circumstances "a merger will take place in equity, where no intention to prevent it has been expressed, and none is implied from the circumstances and interests of the party." Here the interest of defendant might have been considered, we assume, to oppose the merger. But its subsequent sale of the property, as unencumbered, shows rather conclusively that it considered that a merger had taken place. See also Flanigan v. Sable, 44 Minn. 417, 46 N. W. 854; National Inv. Co. v. Nordin, 50 Minn. 336, 52 N. W. 899; Quevli Farms, Inc. v. Conner, 176 Minn. 609, 224 N. W. 264; and annotation at 46 A. L. R. 322.

There is a claim for defendant that when the Flanagan homestead was sold to Mrs. Flanagan, her husband, plaintiff's assignor, agreed as part of the consideration for the deal that he would make no further claim against the bank; that is, that the very claim now in suit was compromised and settled. The trouble is that there again we are dealing with conflicting testimony, with no written evidence of the alleged compromise to aid decision. Flanagan denies that it was made. We do not try facts. We but review them to determine whether decision or verdict is reasonably supported by evidence. We cannot say that this verdict is not so supported. It may be as contended for defendant that the result is a miscarriage of justice. If so, defendant has no other to blame than management which permitted an important transaction, involved in complicated litigation, to be conducted by a layman rather than a lawyer. In retrospect, it seems but another case of a banker attempting to practice law, this time in his own behalf. If so, the result has been profitable only to plaintiff and counsel who have been called in, to their own benefit, for remedy rather than prevention.

Question is made here of the correctness of computation of the amount of recovery fixed by the verdict. It is a problem of arithmetic not presented during the trial or by motion for new trial. So it is not for our consideration. If there is demonstrable arithmetical error in the verdict (e. g. if the fact has been ignored that Flanagan's interest under the first item mentioned by exhibit Q was limited to a maximum of $2,000.00), it can yet be corrected below by appropriate motion and order.

In the interest of brevity, many assignments of error going to rulings of evidence and the like have not been discussed. They have been considered thoroughly but found. not to present prejudicial error.

Order affirmed.

*Lystad & Mantor,* for respondent.

[1] Reported in 261 N. W. 3.