**FRANK SULLIVAN COMPANY,**
Appellant,

v.

**MIDWEST SHEET METAL WORKS,**
Appellee.

**No. 17406.**

United States Court of Appeals
Eighth Circuit.

July 31, 1964.

Vincent P. Courtney, of Allen & Courtney, St. Paul, Minn., made argument for appellant and filed brief with Joseph P. Coughlin, Cambridge, Mass.

James Geraghty of Altman, Geraghty & Mulally, St. Paul, Minn., made argument for appellee and filed brief.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Midwest Sheet Metal Works, a Minnesota partnership, instituted this diversity suit against Frank Sullivan Company, a Boston contractor, to recover damages for breach of contract. The jury returned a verdict in favor of Midwest for $85,000. Judge Devitt denied Sullivan's motion for judgment n. o. v. or a new

trial. 215 F.Supp. 607. The controversy arises out of the project for the extension and remodeling of the United States Post Office and Customs House at Saint Paul. Minnesota law controls. Although Sullivan asserts twenty separate points on its appeal, these come down essentially to four primary issues:

1. The identity of Midwest's Exhibit 5 as the agreement between the parties, and its effectiveness as a contract.

2. The effect of the absence of the prime contractor's consent to the agreement.

3. The authority of Sullivan's agent to sign the agreement.

4. Damages.

The prime contractor on the project was Electronic & Missile Facilities, Inc., of New York City (EMF). On December 4, 1961, EMF and Sullivan executed a lengthy and detailed subcontract whereby Sullivan undertook all plumbing, heating apparatus, air conditioning, and ventilation work on the job for an agreed price of $1,650,000. This contract was executed on behalf of Sullivan by Francis J. Sullivan (Frank) as its president.

In the fall of 1961, before the formal execution of the agreement between EMF and Sullivan, Frank had contact with Michael J. Elnicky, the dominant partner of Midwest, about Midwest's taking on the sheet metal and air conditioning portion of Sullivan's subcontract. Sullivan had even invited a quotation from Midwest for this work. On November 1 Midwest quoted a figure in excess of a million dollars. Frank by telephone told Elnicky that this bid was about $200,000 too high. Elnicky indicated he might reduce his price somewhat but could not approach Sullivan's suggested figure. Frank testified that he then told Elnicky, "Well, look, we have got a fellow going out there, and I will show you that these are not prices that we dreamed up, these are prices that we used in making our bid, and we got them confirmed by letters by reputable people".

Near the close of 1961 EMF told Sullivan that it was imperative that the work in Saint Paul be started. Sullivan promised EMF that it would get a superintendent, a foreman, and men and material on the job by the end of January. Sullivan sent John Sullivan (Jack) from Boston to Saint Paul in early January. On this trip he conferred with EMF's superintendent on the project. Jack was back in Minnesota later in the same month with Byers who was to be Sullivan's general superintendent on the job. Before he left Boston on this second trip Jack had been instructed by Frank to look over the labor situation in the area, to check in with prospective subcontractors, to see Elnicky and give him quotations which "will back up the reduction of his bid", and to "get the job started". Frank gave Jack the job estimates which had been prepared by Sullivan but he was not given and had not seen the prime contract.

Upon their arrival Byers called upon local union business agents, purchased material and tools, received other equipment from Boston, and placed four steamfitters on the job.

On Monday, January 22, Jack came to Midwest's office. This was the first time Elnicky saw him. Elnicky and some of his employees testified that Jack told him on this visit that he was "part of the [Sullivan] organization" and had "a piece of it". Jack denied that he made any such statement. Elnicky conceded that he made no attempt to check Jack's authority with the Sullivan home office and that he did not ask for written evidence of it.

Elnicky also testified that Jack early in this first meeting suggested that Midwest price off "the whole works"; in any event, Elnicky indicated that he was interested in taking over the entire Sullivan job. Jack did not object and said that he would try to get a copy of the prime contract for him. The two men met again on Tuesday when Jack permitted Elnicky and his people to review the bids Sullivan had received. By Wednesday Jack obtained a copy of the prime contract from EMF's office on the job. He gave it to Elnicky who kept it over

night. Meanwhile, Jack talked with other prospective subcontractors. Elnicky and Jack met further, and sometimes socially, during the same week. Jack told him that Sullivan would have to have a minimum of $100,000 if Elnicky took over. On Thursday Jack told Frank by telephone of the discussions he was having with Midwest. As to this conversation Frank testified that he told Jack that this could not be done; that EMF wanted Sullivan on the job; and that Jack should "Pick up what you got and come home". Midwest finished its estimating on Saturday, January 27. That evening Jack was at Elnicky's home with Elnicky and two of the latter's men. They discussed costs and what Elnicky might offer to do the job but no conclusion was reached.

Early in the afternoon of the next day, Sunday, Elnicky came to Jack's hotel room. Jack was planning to return to Boston. Elnicky arrived with a fifth of scotch. The men were together for three and one-half hours, discussing the job and drinking the entire fifth. Byers was present but left for a time to get the copy of the prime contract which had been left elsewhere. Elnicky made an offer of $1,550,000 to perform the work. This was discussed as was the question of what to do with the equipment and materials which Sullivan already had on the job. Jack then started to write something out. Elnicky dictated part of it. Several drafts were made. Later Jack dictated a draft to a hotel typist and he and Elnicky signed it. Elnicky then took Jack to the airport. The typed draft is Midwest's Exhibit 5 * and is the docu-

ment in controversy. It was admitted in evidence over Sullivan's objection.

The testimony as to the execution of the exhibit is in sharp conflict. Jack testified that he told Elnicky that this agreement was subject to approval by Frank and EMF; that there was no sense in working out other details until this was done; that it was his intention that Exhibit 5 be merely a proposal by Elnicky to Sullivan; and that he did not intend thereby to turn the Sullivan contract over to Midwest. Byers testified that Jack told Elnicky that it had to be approved by Frank and EMF; that Elnicky acknowledged this; and that he, Byers, had expressed a hope that Frank would approve it so he "could go home". Elnicky flatly denied that Jack had said Exhibit 5 was subject to approval by Frank and EMF.

The next day, Monday the 29th, Jack called Byers from Boston to see if Elnicky had someone on the job as the writing provided. Byers called Elnicky who told him he would have someone there on Tuesday. On Tuesday Jack and Elnicky conferred by telephone. Byers then sent Elnicky's men away from the job. On the same day, January 30th, Jack, signing on behalf of the Sullivan Company, wrote Midwest that "The agreement made on January 28th, 1962, between the Midwest Sheet Metal Company and the Frank Sullivan Company is hereby cancelled", and that they would try to arrange for Midwest to quote on the job's ventilating, air conditioning, and refrigeration. Jack testified that he wrote this letter without discussion with

---

* "Hotel Saint Paul
St. Paul, Minnesota
January 28, 1962
"The Midwest Sheet Metal Co.
340 Taft St.
Minneapolis, Minnesota
"The Midwest Sheet Metal Company of 340 Taft St., Minneapolis, Minnesota, agrees to take over Frank Sullivan Company's contract with Electronic Missile Facilities, Inc., in the amount of One Million Five Hundred Fifty and 00/100 Dollars ($1,550,000).
"The cost of the bond will be paid for

by the Frank Sullivan Company.
"The Midwest Sheet Metal Company will man the above mentioned project on January 29, 1962, to show good faith regarding this contract. The above agreement is made between
Midwest Sheet Metal
Midwest Sheet Metal
M. J. Elnicky
Frank Sullivan Co.
John Sullivan "
The discrepancy between the words and the figures is readily apparent.

Frank. Midwest's receipt of that letter led to the present suit.

Jack Sullivan's status is obviously of vital importance. In January 1962 he was 29 years of age. He was a high school graduate and had had one year of "night college". He held a plumber's union card and a journeyman plumber's license. He had worked for Sullivan for ten years. He had started there as a plumber and, by 1959, was a job superintendent. About mid-1960 he became an "outside superintendent". In this capacity he traveled to various jobs, examined labor and material situations and reported back to Sullivan. He did no hiring or firing. He did not order materials. He did make recommendations. He was not an officer, director, or shareholder of Sullivan. He was not related to Frank. He had nothing to do with obtaining or negotiating subcontracts. He had had no experience in sheet metal or air conditioning. He had done no estimating. He had been given no specific authority to sign any contract for Sullivan or to assign Sullivan's subcontract with EMF.

In January 1962 Elnicky was about 52. He had been in sheet metal and similar work for many years and had run his own business since 1947.

A. The contract. Sullivan's basic argument here is, first, that Midwest's lawsuit is concededly bottomed on Plaintiff's Exhibit 5 but Midwest utterly failed to prove that Exhibit 5 was the actual contract, if one existed at all, between the parties, and second, that Exhibit 5 in any event is not sufficiently clear and definite to be valid and to constitute an enforceable contract. It argues that Elnicky's own testimony on cross-examination disclosed the presence of several provisions (reimbursement to Sullivan for job costs already incurred; Midwest's undertaking the expense of continuing Byers on the job until its own men could be lined up; Sullivan's guaranty of the bids it had received) which were vital but which did not appear in Exhibit 5; that the exhibit at best was incomplete; and that the court's rulings on evidence and its instructions were prejudicial to

the extent they were inconsistent with this approach.

■ Under Minnesota law one who confines his pleading to an express contract and fails to take advantage of rules as to liberal amendment is bound by his pleading and must prove that contract. Roberge v. Cambridge Coop. Creamery Co., 243 Minn. 230, 233–234, 67 N.W.2d 400, 402–403 (1954). Further, if

" * * * substantial terms are left open and subject to further agreement, which is never reached, there is not only no complete agreement but no contract at all. * * * The next inquiry is whether, there being an agreement which is asserted to be a contract, it is complete. It is not unless it is in all essential terms definite and certain or capable of being made so by the aid of competent evidence and permissible interpretation. If as a contract it be incomplete, a court can no more complete it for the parties than it could make it for them in the beginning." Wells Const. Co. v. Goder Incinerator Co., 173 Minn. 200, 205–206, 217 N.W. 112, 114 (1927).

"There is no contract where there is no mutual and final assent to all the essential terms of a bargain." New England Mut. Life Ins. Co. v. Mannheimer Realty Co., 188 Minn. 511, 513, 247 N.W. 803, 804 (1933). Vagueness and indefiniteness may affect the validity of an alleged agreement. "If an alleged contract is so uncertain as to any of its essential terms that it cannot be carried into effect without new and additional stipulations between the parties, it is not a valid agreement." Ames-Brooks Co. v. Aetna Ins. Co., 83 Minn. 346, 349, 86 N.W. 344, 345 (1901). To the same effect are Gruesner v. Thatcher, 158 Minn. 470, 471, 197 N.W. 968, 969 (1924), and Druar v. Ellerbe & Co., 222 Minn. 383, 395, 24 N.W.2d 820, 826 (1946). And "where substantial and necessary terms are specifically left open for future negotiation, the purported contract is fatally defective." King v. Dalton Motors, Inc.,

**38**

260 Minn. 124, 126, 109 N.W.2d 51, 52 (1961). But

"A proper administration of justice does not permit an overzealous quest for subtle ambiguity to destroy the intent of the parties when the court, despite some incompleteness and imperfection of expression, can reasonably find that intent by applying the words used, with all their reasonable implications, to the subject matter as the parties themselves, under all the surrounding circumstances, must have applied, used, and understood them. This court is reluctant to invoke the principle that indefiniteness prevents the creation of a contract where a just result, consistent with a reasonably expressed intent of the parties, can be reached by upholding the agreement." Hartung v. Billmeier, 243 Minn. 148, 151, 66 N.W.2d 784, 788 (1954).

Ames-Brooks Co. v. Aetna Ins. Co., supra, p. 349 of 83 Minn., p. 345 of 86 N.W. Reasonable certainty is thus the standard. Restatement of the Law of Contracts, § 32.

In the light of the foregoing authorities, we affirm on this point. We do so for the following reasons:

1. As we read the pleadings and the record in its entirety we are readily satisfied that Midwest's case did rest on Exhibit 5 as constituting the contract between the parties; that the jury by its verdict so found; and that the record contains substantial evidence to support and justify that finding.

2. While Exhibit 5 may have been born with somewhat of an alcoholic background, this fact alone does not make it any less a contract. Evidently both Elnicky and Jack desired or were content to negotiate in that kind of atmosphere. It is not now claimed that there was duress or that Elnicky took advantage of Jack through alcohol.

3. Exhibit 5 on its face is clear and complete. It succinctly states that Midwest "agrees to take over" Sullivan's contract with EMF. It states the figure

at which it does so. It leaves a $100,000 gross profit margin, less the cost of the bond, for Sullivan. It calls for immediate manning of the job by Midwest. It contains no ambiguity and Sullivan so concedes.

4. Although, as Sullivan observes, Exhibit 5 consists of but one page, as contrasted with the many pages of the subcontract between EMF and Sullivan, this difference is understandable. The document could have been more formal but it was formulated by two laymen and it in effect incorporated the detailed EMF subcontract by reference. By so doing it achieved certainty as to underlying details. Sullivan itself was originally content in this respect or it would not have made the subcontract with EMF.

5. The discrepancy between the words and the figures of Exhibit 5 is not fatal. It is true that the normal rule is that, where there is a discrepancy of this kind, the words and not the figures control. Gran v. Spangenberg, 53 Minn. 42, 45, 54 N.W. 933, 934 (1893). This usually does not invalidate a contract. The cited case also discloses that there are even situations where resort may be made to the figures. In any event, despite the facts that the difference here was a half million dollar one and that it should have been noticed by either Jack or Elnicky, there was no confusion in the minds of the two men. Each knew that the proper amount was $1,550,000. No one was misled.

6. Exhibit 5 does not have that vagueness or indefiniteness or incompleteness which, in the several Minnesota cases cited above, has served to defeat alleged contracts.

7. Sullivan's reliance on provisions which it claims were discussed and agreed upon between Elnicky and Jack but which are absent from Exhibit 5 is, we think, misplaced. As we have noted, Exhibit 5 in itself is complete and unambiguous. Even if we assume that the cross-examination of Elnicky in bringing out these details was permissible, we cannot regard that testimony as being in derogation of

Exhibit 5 and its status or as constituting anything other than an enumeration of details which Elnicky personally discussed in the negotiations leading up to the signing of Exhibit 5. This falls short of making those details either part of the actual contract or conditions on which its validity and effectiveness depended, and we refrain from according them that dignity.

8. Jack's own letter of January 30, 1962, is almost persuasive in itself. It refers to "the agreement" of January 28 "between Midwest * * * and * * * Sullivan" and reaches out to cancel it.

B. *EMF's consent.* The subcontract between EMF and Sullivan provided that it should be binding upon assigns but that Sullivan "shall not assign" it or subcontract "any part or all of the work * * * without the prior written consent of" EMF. Sullivan's points here are that the consent of EMF to the Sullivan-Midwest contract was a condition precedent to the contract's effectiveness and that the trial court's failure so to instruct the jury was prejudicial error.

 Sullivan asserts that its presence in the project was of importance to EMF and that the latter, because of previous contract with Sullivan, wanted Sullivan personally on the job. This may very well be true so far as EMF is concerned, although we observe, first, that the record indicates that EMF expected Sullivan to subcontract at least some of its work, such as airconditioning and sheet metal, in which Sullivan never did engage, and, second, that if the Sullivan-Midwest contract were itself a subcontract, Sullivan's responsibility to EMF would continue to exist. Nevertheless, we think that the trial court was right when it held, pp. 609–10 of 215 F.Supp., that the prohibition was one for the benefit of EMF, that it was not available for Sullivan's defensive advantage, and that it was not a condition precedent for Exhibit 5. Despite the non-assignment provision, Midwest, by contract with Sullivan, may acquire rights enforceable against Sullivan and unless the latter appropriately protects itself against the possibility of EMF's failure to consent, those rights, upon violation or breach, may result in recoverable damages. Restatement of the Law of Contracts, § 176; 3 Williston on Contracts (3d Ed.1960), § 422, p. 140. Construction cases in point are Nolan v. J. & M. Doyle Co., 338 Pa. 398, 405, 13 A.2d 59, 63 (1940) and Charles I. Hosmer, Inc. v. L. P. Federico & Son, 89 N.H. 378, 380, 199 A. 567, 568 (1938). See Portuguese-American Bank of San Francisco v. Welles, 242 U.S. 7, 37 S. Ct. 3, 61 L.Ed. 116 (1916); McLaughlin v. New England Tel. & Tel. Co., 345 Mass. 555, 188 N.E.2d 552, 558 (1963); Sykes v. First Nat'l Bank, 2 S.D. 242, 49 N.W. 1058, 1061–1062 (1891). See, also, Hogue v. Minnesota Packing & Provision Co., 59 Minn. 39, 60 N.W. 812 (1894). As the Supreme Court of Pennsylvania noted in Nolan, "the suit against appellant is upon an independent contract which it breached by refusing to permit appellees to perform under it."

C. *Jack's authority.* Midwest does not contend that the record supports a finding that Jack possessed actual authority to act on behalf of Sullivan. The issue is one of apparent authority. Sullivan asserts that the evidence as a matter of law was insufficient to support a finding of apparent authority and that the court's submission of this issue to the jury and its rulings and instructions consistent therewith were prejudicially erroneous.

Jack certainly assumed the mantle and the posture of responsibility and authority. There is evidence to the effect that he professed an ownership interest in Sullivan; possessed and produced the bids and the cost estimates the company has assembled; permitted Elnicky to review them; obtained a copy of the EMF-Sullivan subcontract for Elnicky; mentioned to others than Elnicky his interest in contracting out the entire Sullivan portion of the job; demonstrated a permissive attitude toward Midwest's interest in taking on the full subcontract; was in contact with Elnicky's performance bond man and asked him to confirm his comments by letter; accepted El-

nicky's entertainment favors; bargained continuously for a week; and even wrote the letter of cancellation.

But apparent authority must be founded on something more than the conduct and statements of the agent himself. Liability can be imposed upon a principal only "for that appearance of authority caused by himself". 2 Williston on Contracts (3d Ed.1960), § 277A, pp. 222–24; Mulligan v. Farmers' Nat'l Bank, 194 Minn. 451, 455, 260 N.W. 630, 632 (1935); Restatement of the Law of Agency 2d, § 8 and § 27, comment a. Of course, a degree of reasonableness and of diligence is required of one who deals with the agent. Hill v. James, 148 Minn. 261, 265–266, 181 N.W. 577, 579 (1921); Sauber v. Northland Ins. Co., 251 Minn. 237, 245, 87 N.W.2d 591, 598 (1958); Coursey v. Firestone Tire & Rubber Co., 33 F.2d 49, 52 (8 Cir. 1929), cert. denied 280 U.S. 603, 50 S.Ct. 85, 74 L.Ed. 648. Unless the evidence is conclusive, apparent authority is an issue of fact for the jury. Schoenborn v. State Bank of Richmond, 159 Minn. 205, 198 N.W. 801 (1924). The burden of proof is on the one asserting the agency. Dispatch Printing Co. v. National Bank of Commerce, 109 Minn. 440, 448, 124 N.W. 236, 239, 50 L.R.A.,N.S., 74 (1910); Adams v. Barron G. Collier, Inc., 73 F.2d 975, 978 (8 Cir. 1934).

We find in this record adequate support for the submission of the issue of apparent authority to the jury. Accepting the evidence, as we must, in the light most favorable to the prevailing plaintiff, we have, apart from and in addition to Jack's own acts and statements, all the following: (1) Sullivan sublet part of every job it had for there were certain types of work (air conditioning and sheet metal, for example) which it never performed; (2) Sullivan sent Jack to Saint Paul to get the job started; (3) Sullivan instructed Jack to get in touch with area people in the construction industry and to obtain subcontract offers; (4) Sullivan placed Jack in possession of the breakdown of costs it had prepared and of the bids it had received; (5) Frank told Elnicky that he had a man going out to Minnesota; (6) Jack possessed the Sullivan name; (7) Jack was the highest person in authority in Sullivan's employ on the job; (8) so far as the Saint Paul job was concerned, Byers followed Jack's instructions; (9) Jack, while he was in Saint Paul the week of January 22, was in telephone communication with Boston, and, specifically, talked with Frank; and (10) Frank knew that Jack was discussing with Elnicky a complete takeover by Midwest and yet did nothing to disavow his status to Elnicky. And, for what it is worth, Jack was still with the Sullivan Company at the time of the trial.

Of course, there is an opposing factual argument, namely, that Sullivan had given Jack no instructions to turn over the entire job; that Jack was not supplied with a copy of the EMF-Sullivan subcontract and had to obtain it from the EMF man on the job; that the preliminary conversations between Sullivan and Elnicky had only to do with a limited area of work; that Elnicky knew who Frank was and was in communication with him; and that Elnicky did not inquire of Jack or of Frank as to Jack's authority. But this is just another argument for the trier of fact. The jury was not persuaded.

Sullivan places great emphasis on Elnicky's failure to make inquiry as to Jack's authority, and it urges the important nature of the contract as demonstrated by the amount involved and the time required for its performance. This argument, however, cuts both ways. If the job was so large and so important, a jury might properly infer that Sullivan's top man on the project was there with workable authority. We feel that the cases Sullivan cites in support of its argument are distinguishable on their facts. Hill v. James, supra, concerned a traveling salesman, a fact which the court stressed, and a questionably completed contract. The court readily recognized that a principal may clothe even such a salesman with apparent authority. Dispatch Printing Co. v. National Bank

of Commerce, supra, concerned a Saint Paul newspaper's Minneapolis advertising solicitor-collector and his indorsing checks drawn in favor of the newspaper and depositing them in his own account. Mooney v. Jones, 238 Minn. 1, 54 N.W. 2d 763 (1952) concerned a mortgagor's representation, claimed to be made on behalf of the mortgagee, to a contractor that the latter's lien waiver would not affect his lien rights for future work. Language in these opinions relative to an agent's actual authority and a third person's duty to inquire is accepted law but the Minnesota court has consistently recognized the established principles of apparent authority. Illustrative is the court's comment in Mooney itself, p. 767 of 54 N.W.2d, that "the record is insufficient to show that National Guardian did anything to hold Gustafson out as its agent". See, also, Cauger v. Gray Motor Co., 173 Minn. 370, 217 N.W. 347, 348 (1928). And in Sauber v. Northland Ins. Co., supra, Chief Justice Knutson, in speaking for the court, said, "Apparent authority exists by virtue of conduct on the part of the principal which warrants a finding that a third party, acting in good faith, was justified in relying on the assumption that the agent had authority to act." [footnote omitted]

The situation here strikes us as one where, as the negotiations developed, Jack sensed the opportunity to bring his company out of the project at a convenient profit of $100,000, without additional cost or participation, and further sensed that this would be a feather in his cap if he could bring it about. Whether Sullivan sensed this, desired it, and encouraged it, we shall, of course, never know with positive assurance. But the record supports just such an inference by the jury. We are not at liberty to overturn that body's conclusion.

■ D. Damages. Anticipated profits may be an element of damage where "their amount is shown with a reasonable degree of certainty and exactness" and where the nature of the business is "such as to support an inference of definite profits grounded upon

a reasonably sure basis of facts". However, "This rule does not call for absolute certainty". Johnson v. Wright, 175 Minn. 236, 240, 220 N.W. 946, 948 (1928); Appliances, Inc. v. Queen Stove Works, Inc., 228 Minn. 55, 36 N.W.2d 121, 125 (1949).

Sullivan argues that there was no reasonable basis in the evidence for the jury to return any verdict for damages and certainly none for a verdict of $85,-000; that the verdict is the result of speculation; and that Elnicky was not competent to give his opinion on the cost of doing the work.

Elnicky's testimony was to the effect that his anticipated gross profit was $187,000 and that this was computed on the basis that his base costs would be $1,362,000. This cost figure depended in part upon Sullivan's own estimates submitted to Elnicky. There is, naturally, a distinct element of uncertainty in all this, and an argument can be made that Elnicky's own evaluation of anticipated profit was too optimistic. On the other hand, every contractor interested in the Saint Paul project may be expected to have anticipated a profit. The week-long negotiations between Elnicky and his people and Sullivan were primarily concerned with Midwest's costs and profit. Sullivan's estimates, suppliers' bids, Midwest's computations, and Elnicky's best judgment as an experienced contractor properly provided, it seems to us, an appropriate basis on which the jury could reach its conclusion.

■ Elnicky's concession on cross-examination that when he figured a job "We do not know how much is going to be overhead or how much is going to be profit * * *" and that labor costs on a job are "guesstimates", do not strike us as concessions of a lack of reasonable certainty. The contracting business is hazardous and small errors or unforeseen developments can be costly. See Southern Fireproofing Co. v. R. F. Ball Constr. Co., 334 F.2d 122 (8 Cir. 1964). But this does not disqualify a competent and experienced contractor's best estimate, reasonably compiled, as acceptable evidence.

**42**

To hold otherwise would tend to bar recovery in all construction cases. The Minnesota court, in Johnson v. Wright, supra, pp. 240–241 of 175 Minn., p. 948 of 220 N.W., has made some revealing comments applicable to a case of this kind:

> "Johnson admits that sometimes he makes a profit and sometimes he sustains a loss in projects of this character. That is true of all work. * * * But we must assume that the price contemplates and is commensurate with a certain amount of probable disappointment, trouble, and loss. * * * Johnson has had nearly 40 years' experience as a driller. * * * Does the situation permit a jury to safely find that Johnson could make a profit having in mind the possibility of trouble and loss before reaching such depth? We think it does, though the question is a close one. * * * What is the common, usual, and ordinary experience of men in such work? It would seem to be favorable to the occupation, or else one would not continue in the work so long as Johnson has; otherwise, men would not venture the hazards of such contracts. * * * We are of the opinion that the evidence is sufficient to authorize and enable the jury to find the loss of profits with reasonable certainty, and that such determination is not conjectural or speculative."

Although uttered in a different setting, the Supreme Court's language in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), is helpful:

> " * * * there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount."

This court has used this in still another kind of case. N.L.R.B. v. Kartarik, Inc., 227 F.2d 190, 192–193 (8 Cir. 1955).

 Upon our review of the record in its entirety, we find ourselves not in accord with Sullivan's attack on damages. Instead, we agree with the trial court that the jury's verdict was reasonable when considered in the light of all the testimony and that its determination of the amount of damages is properly supported.

We have examined all other points urged by Sullivan and conclude that none of them reveals any prejudicial error.

Affirmed.

