DECISION
This matter was tried to the Court sitting without a jury on November 1, 2005. The case was tried on the Plaintiff's Complaint for the balance allegedly due and owing on an oral contract for engineering services performed in connection with the construction of a middle school on Broad Rock Road in the Town of South Kingstown. The Defendant has answered the Complaint, denying liability for the balance allegedly owed, and counterclaiming for damages incurred due to Plaintiff's alleged negligent performance of engineering services. The following constitutes the Court's findings of fact and conclusions of law, in accordance with the Rhode Island Rules of Civil Procedure, Rule 52(a).
 FINDINGS OF FACT
1. Plaintiff/Counterclaim Defendant is a Rhode Island corporation with a principal place of business in South Kingstown, Rhode Island, and does business as a civil engineering firm. The principal of the Plaintiff is Raymond W. Schwab, a licensed civil engineer. This party will be referred to hereafter as "Schwab."
2. Defendant/Counterclaim Plaintiff, L.A. Torrado, Architects, is a Rhode Island corporation having its principal place of business in Providence, Rhode Island, and does business as an architectural firm. The principal of the Defendant is Louis A. Torrado, a licensed architect. This party will be referred to hereafter as "Torrado."
3. On or about September 28, 1998, Torrado entered into a standard form agreement with the South Kingstown Building Committee for design and construction services associated with the pre-referendum design and construction of a new middle school on Broad Rock Road, in the Town of South Kingstown.
4. In April, 1999, Schwab, who at one time served as the Town Engineer for the Town of South Kingstown, discussed with Torrado the performance of engineering services for the proposed project, in particular the site engineering. Torrado requested that Schwab serve as the site engineer for the project.
5. Thereafter, Schwab attended a building committee meeting with Torrado, and Torrado introduced Schwab as the proposed site engineer for the project. Torrado was awarded the final contract for architectural services, and Torrado engaged Schwab as the site engineer. At no time was there a written agreement between Torrado and Schwab.
6. The parties discussed compensation at a site visit in 1998 before the project commenced, and again in April, 1999. Because the slope was steep and there were wetlands at the site, it appeared that much time-consuming engineering work had to be done in advance of the award of the construction contract and in advance of other design work. For that reason, and because it appeared that site work costs would not be fixed until the bids were accepted at a later date, Schwab expressed reluctance to handle the project at a fixed "percentage of site cost" basis. Torrado, on the other hand, had requested that Schwab accept a fixed percentage, 4.3%, of the ultimate site costs as compensation for the site engineering. Since Schwab was requesting that Torrado prepare some of the engineering plans, and that Torrado would have the responsibility of coordinating all of the engineers and of handling construction administration on the project, Torrado even suggested that Schwab's compensation be based on 75% of the fee calculated at 4.3%, rather than the full 4.3%. Schwab expressed his unwillingness to do the site work on a fixed percentage basis, and advised Torrado that his hourly rate would be seventy-eight dollars ($78.00) per hour.
7. Without resolving the outstanding issue of compensation, Schwab began to perform site engineering services, and sent monthly bills to Torrado for engineering services rendered. The first bill, dated April 12, 1999, in the amount of $3,633.00, was paid in full. That bill, and all subsequent bills rendered from Schwab to Torrado, reflected compensation on an hourly basis. Bills were rendered monthly, and in some months bi-weekly, from April, 1999 through April, 2000. At no time during that period did Torrado question the hourly basis on which the bills were calculated. All bills rendered by Schwab were paid, except for the April, 2000 bill, showing a balance due and owing of $17,240.00. The total amount that Torrado had paid Schwab on account was approximately $30,630.00.
8. After the voters approved the bond referendum in November, 1999, site plans were being modified by reason of changes proposed for the project. Schwab had to redo much of his initial work in an attempt to reduce construction costs, and ultimately to accommodate a two-story building rather than the one-story building originally contemplated. Although Torrado asked Schwab for his estimate of the likely additional cost of having to redo the site plans, which Schwab estimated to be between $5,000.00 and $15,000.00, the parties never reached a separate agreement as to the amount Schwab would be paid for the redesign work. Ultimately, the Department of Environmental Management (DEM) approved the revised site plans prepared by Schwab.
9. After the site plan bids were accepted by the Town in April 2000, Torrado attempted to have Schwab accept payment on the basis of a fixed percentage of the now determined site costs. Torrado sent a fax to Schwab on April 7, 2000, which contained the final site work estimates prepared by Catalano Construction, Inc., and suggested a reconciliation of the account based on these actual site cost figures. On that basis, Torrado calculated that Schwab was "overpaid" by reason of the payments made by Torrado on accounts presented during the yearlong period from April, 1999 to April, 2000. Schwab, on the other hand, calculated that there remained an unpaid balance due totaling $17,240.00, which was based on an hourly calculation. Schwab responded to the April 7, 2000 fax with a written letter, dated April 10, 2000, in which Schwab set forth his understanding that the site engineering fees were not to be capped on the basis of a fixed percentage of site costs to be determined after the site engineering work was substantially performed. This exchange of correspondence in April, 2000 is the first written communication concerning the basis for payments to Schwab, notwithstanding the fact that Torrado had received eighteen (18) statements from Schwab dated April 12, 1999 through March 15, 2000. On each of those statements the balance was calculated on an hourly basis, contained explicit terms of payment, and did not refer to a reconciliation on the basis of a percentage of actual site costs.
10. By reason of the disagreement over the terms of compensation, Schwab did no further work on the project after April, 2000. Thereafter, as the site contractor began work on the project, certain design issues were raised and brought to Torrado's attention by the construction manager, Dimeo Construction Company. In turn, Torrado sent a letter to Schwab dated July 14, 2000, wherein Torrado pointed out certain so-called "discrepancies" in the site plans prepared by Schwab. These included not allowing for sufficient bus circulation, insufficient cover, and problems with catch basins and pipes. These alleged deficiencies in Schwab's site plans form the basis of Torrado's counterclaim alleging negligent engineering services.
11. In order to address the problems raised by the construction manager, Torrado hired the engineering firm of Cataldo Associates. Cataldo addressed the engineering issues necessary to complete the site work. Among the tasks performed by Cataldo Associates was preparation of drawings constituting modifications to the site, grading, and drainage plans. Cataldo charged and was paid by Torrado an amount totaling $2,280.00. Said payment was to address the site design concerns raised in Dimeo's requests for information ("RFI"), as well as the preparation of revised site drawings. In addition to Cataldo's charges, Torrado testified that he had to accept a $43,000.00 reduction in the fee for architectural services, $33,000.00 of which Torrado estimated was due to site design errors committed by Schwab.
12. Schwab, in a letter dated July 21, 2000, and in his testimony, disputed that he committed any error in his site design. Torrado introduced no engineering expert to offer testimony as to the standard of care that should be employed by a civil engineer performing site design of this nature, or that Schwab acted contrary to such standard of care in the performance of the site engineering services he was engaged to perform.
 CONCLUSIONS OF LAW AND ANALYSIS
In order to enforce the terms of a contract, the Court must find that there was a meeting of the minds between the contracting parties as to each material aspect of the agreement.See Mills v. Rhode Island Hospital, 828 A.2d 526, 528 (R.I. 2003) (holding that in order to establish an express or implied contract, a litigant must prove mutual assent or a "meeting of the minds" between the parties). Certainly, the terms of payment, and whether those terms include payment on an hourly basis, or payment according to some percentage of cost formula, is an essential term of a contract which must be established by competent evidence. See Frank Sullivan Co. v. Midwest SheetMetal Works, 335 F.2d 33, 37 (8th Cir. 1964) (an agreement, asserted to be a contract, is not complete as such unless it is in all essential terms definite and certain or capable of being made so by the aid of competent evidence and permissible interpretation.) At the time Schwab commenced performance, the parties had not reached a final agreement as to the terms of payment, and certainly there is no documentary evidence to suggest the terms agreed to at the time performance began.
Even in the absence of agreement at the time performance commenced, the payment term can be found to have been established during the course of the relationship. See Stan's Lumber, Inc.v. Fleming, 196 Wis.2d 554, 538 N.W.2d 849 (Wis.App. 1995). In this case, the Plaintiff has brought a claim on account for engineering services performed. From April, 1999 through April, 2000, Schwab regularly rendered statements of account to Torrado setting forth the services performed, the hourly rate for such services, any unpaid balances carried forward from previous statements, the balance due and owing, and the terms of payment. It is black letter law that when a statement is rendered to a debtor, and the debtor fails to reply or object within a reasonable time, an agreement may be implied that the account is correct as rendered. Stan's Lumber, Inc., supra; Restatement (Second) of Contracts § 282 (1981); see generally,
1 Am. Jur. 2d Accounts and Accounting § 38 (2004), and cases cited therein.
If Torrado believed that the monthly statements were not an accurate reflection of the terms agreed to, he had ample opportunity to object both to the amount of the statements or the manner by which the balance was calculated. Instead, it was not until after the site work contract came in at an amount substantially below the amount originally contemplated that Torrado took issue with Schwab's hourly method of calculation. For a period of nearly one full year, Torrado accepted the statements rendered and made payments thereon without at any time seeking a clarification of what he believed were the agreed upon terms. The fact that Torrado had percentage of cost arrangements with other engineers on the project does not prove that those identical terms were agreed to by Schwab, especially in light of the fact that the site engineering, in substantial part, had to be completed well in advance of the receipt of final cost figures from the site contractor, and there arose an unanticipated need to change the site plans considerably in light of a modified building design.
Relative to the professional negligence counterclaim, Torrado, as the counterclaim plaintiff, had the burden of proving both the standard of care applicable to civil engineers preparing site plans of this nature, as well as a breach of such standard by the counterclaim defendant, Schwab. In Montuori v. NarragansettElec. Co., 418 A.2d 5, 9 (1980), the Rhode Island Supreme Court held,
 "We have often restated the proposition that a reasonable and legitimate inference that someone was negligent is not necessarily warranted by the mere happening of an accident. Rather, to ensure that a trial justice or a jury will tend to draw only inferences that are reasonable and legitimate and will avoid conjecture, speculation, or surmise, a plaintiff must introduce a sufficiency of competent evidence to establish the essential elements of a prima facie case in negligence. The evidence must establish that the defendant owed a duty of care to the plaintiff and that the defendant breached his duty, and that the defendant's negligence was the proximate cause of the plaintiff's injury." (Citations omitted.)
The only testimony on this subject was from Torrado himself, an architect by profession. There was no expert testimony from an engineering expert, or even from the construction manager, to suggest that Schwab failed to perform reasonable engineering services or that any such failure was the cause of damage to Torrado.[1] The absence of such expert testimony is fatal to Torrado's counterclaim for engineering negligence. Mills v.State Sales, Inc., 824 A.2d 461, 468 (R.I. 2003) (holding that expert testimony is required to establish any matter that is not obvious to a lay person and thus lies beyond common knowledge);see also Schenck v. Roger Williams Gen. Hosp., 119 R.I. 510,382 A.2d 514 (R.I. 1977).
 CONCLUSION
For the foregoing reasons, judgment shall enter for the Plaintiff, Raymond W. Schwab Associates, Inc., in the amount of $17,240.00, together with interest at the contractual rate of 21% per annum from April 20, 2000, and costs.[2] Judgment shall also enter for the Plaintiff/Counterclaim Defendant, on the counterclaim.
[1] There was ample credible testimony from Schwab that the alleged defects were matters discussed and agreed to, were the result of cost-saving accommodations, or were the result of changes to the site made necessary by changes to the building plan. Schwab in fact testified credibly that the alleged defect in drawing the building's "footprint" on his drawings, one of the alleged negligent acts, was due to the fact that he received the "footprint" from Torrado, and simply transferred that information directly to his site plan.
[2] See Pearce v. Hennessy, 10 R.I. 223, 227 (1872) (holding that stipulated interest may be imposed in accordance with the parties' contract.)