JOHN F. DRUAR AND ANOTHER, *d. b. a.* DRUAR AND
MILINOWSKI, v. ELLERBE AND COMPANY.
HITCHCOCK & ESTABROOK, INC. v. SAME.[1]

November 1, 1946.

No. 34,137.

[1]Reported in 24 N. W. (2d) 820.

*Harry W. Oehler,* for appellants.

*Doherty, Rumble, Butler, Sullivan & Mitchell,* for respondent.

MAGNEY, JUSTICE.

Plaintiffs John F. Druar and Arthur S. Milinowski, copartners, and plaintiff Hitchcock & Estabrook, Inc., a corporation, as separate entities, were engaged in the practice of engineering. Defendant Ellerbe and Company, a corporation, is an architectural firm. For some time prior to December 1941, each organization had attempted without success to secure contracts from the federal government for the rendition of engineering and architectural services in connection with its extensive military building program. Plaintiffs claim that in the latter part of December 1941 the three organizations agreed to pool their abilities and facilities and, in the words of their complaints, that they—

"should use their or its best efforts to secure from the government of the United States the award of contracts for the rendition of engineering and architectural services and that all contracts awarded to them or any of them * * * should be received and executed by or on behalf of all of them and that all work to be done under any such contracts should be done by all of them and that all monies and profits received * * * should be immediately divided equally * * *."

They claim that the Ellerbe company breached this alleged agreement by entering into a contract with the federal government for the rendition by itself alone of engineering and architectural services in connection with the development of a Bombardment Air Base at Great Falls, Montana, and in their separate actions for accounting each seeks to recover $33,500, representing one-third of the fees received by defendant for the performance of that work.

On motion by plaintiffs, the court agreed to submit the following special question to the jury:

"Did the plaintiffs, in each action, and the defendant in each action, on or about October 1, 1941, agree with each other and one another, as follows:

"That during the present war, the best efforts of each would be used to secure from divisions or agencies of the United States Government, the award to them of contracts for the furnishing of engineering and architectural services; that all such contracts so awarded to them or any of them, would be performed by all of them; and that all profits therefrom would be equally divided between them."

At the close of plaintiffs' testimony the court directed a negative answer to the special verdict and a general verdict in favor of defendant in each case. Plaintiffs appeal from an order denying their motion for a new trial.

As stated, plaintiffs Druar and Milinowski were engaged in the practice of engineering. They acted as consulting engineers on waterwork, sewer, electric-light and hydroelectric projects and did some general engineering. Estabrook & Hitchcock was also engaged as a consultant in municipal engineering work. Defendant was engaged in the practice of architecture. On December 20, 1941, Estabrook and Hitchcock, officers of Estabrook & Hitchcock, Inc., Thomas F. Ellerbe, president of defendant, and Druar and Milinowski held a conference in Ellerbe's office. Ellerbe had never met Estabrook and Hitchcock prior to this meeting, but he and Druar and Milinowski had a slight social acquaintance. Plaintiffs claim that the oral contract sued upon was entered into at this meeting and at two subsequent conferences held on December 24, 1941, and January 2, 1942. If we are able to spell out a binding contract from what was said at these three meetings, plaintiffs are entitled to prevail. If we are unable to do so, there must be an affirmance. It is necessary, therefore, to quote extensively from the testimony and from it to determine the legal effect of the conversations.

Immediately prior to the meeting of December 20, 1941, plaintiffs had been informed through Ellerbe that the government had offered the three concerns a contract to design a Bombardment Air Base at Rapid City, South Dakota, estimated to cost $10,000,000. The parties met on that day to discuss this and also to become acquainted. The banding together of the three concerns for the dura-

tion of the war for the purpose of soliciting architectural work from the government and performing that work was also the subject of conversation.

Milinowski testified that as to the general arrangement talked over at that meeting he was—

"unable to say what was said, other than it was a matter of general conversation, * * * that first conversation was casual, it was more or less of a mutual congratulatory meeting, you might say, about the outcome of our efforts so far. * * *

"Q. What did Druar say in Ellerbe's presence?

"A. He said that it was fine, that we had now at least gotten something, that now it was up to us to perform and perform it well, that if we did, we could expect more consideration and more work for the group. * * * I remember his making the remark: 'Well, now, it is all agreed that we go on and try to get more work * * * and we have got to perform this contract well to get more and we will be getting along very nicely,'" and Mr. Ellerbe said: "'That is right; it is understood we are all to go and get work and perform it together.'"

Joseph B. Estabrook, an officer of Hitchcock & Estabrook, testified that at that meeting Druar said:

"'* * * that in a matter of several conversations with Mr. Ellerbe this plan of taking in these three firms had been agreed upon * * * now we had some work that apparently was going to be a good entering wedge," and that he, Druar, "was careful to ask each of us, including Mr. Ellerbe, if that was O. K. with them, and each man said 'Yes.' So Mr. Hitchcock * * * then asked how the fees would be divided, and I suggested—I think it was I suggested—that they be divided evenly three ways, to save bookkeeping. I remember that was in my mind, and that Mr. Ellerbe thought probably it would be all right for a starter. And that was the major part of the discussion."

Paul C. Hitchcock, also an officer of Hitchcock & Estabrook, said that at the meeting of December 20 there was a general discussion. He testified:

"* * * I * * * raised the question as to how in this group association we would handle the matter of the assignment of the fees * * * and Mr. Ellerbe suggested that the fees be split three ways. Mr. Ellerbe's remark to that arrangement was that it was perfectly acceptable to him, * * *. Mr. Druar * * * said in effect * * * that he had finally gotten the group together, because it was apparent that there was some work definitely in prospect and wanted to be sure that all three of the firms and all of the principals of them understood that we were associating together for the purpose of getting contracts to do engineering work on war plants of various and sundry kinds, and that the reason we were associating together was that we had an organization that way which could handle almost any type of work that might come up and that he wanted to be sure that everyone agreed that that was the status of the affairs and that we were going to continue on attempting to get work as a group. And Mr. Ellerbe agreed that that was the idea and so did the other members, Mr. Druar, Mr. Milinowski, Estabrook, and myself. * * * Mr. Druar's conversation was generally along those lines. * * * The associating together for the promotion of obtaining government work * * * in the future * * *. I said in effect that the organization was one that would continue right along until there was no more government contracts which we would be interested in."

On cross-examination he said:

"I said that we would associate together and continue to get government work until there was no more government work of that nature."

Mr. Druar, who apparently was the most active of the parties in connection with arrangements for joint activities and who termed himself the "go-getter" of the group, testified that at the first meeting on December 20 he said:

"* * * we had been attempting each individually to secure federal contracts, that it was time we banded together so as to present a better front to the federal government in the matter of se-

curing contracts * * * and I asked Mr. Ellerbe if he still wanted to continue into the proposition of joining the two others in the development of the work, that he acquiesced, said 'Yes,' and I asked Mr. Estabrook and Mr. Hitchcock, and of course my partner. I asked him also and acquiesced myself to the agree—that we all come together for the duration of the war * * * in providing and finding contracts which we would execute jointly and divide the proceeds thereof or any profits we made on the development of this work. * * * I put that latter part in the form of a question and asked each one personally if they were satisfied to join with me in this project.

"Q. What was the answer, first, say of Ellerbe?

"A. Yes, that he would.

"Q. And what was the answer of the others then present?

"A. The others all answered 'yes.' "

We have quoted fully the material parts of the conversation of December 20 bearing on the question before us. It is evident that the chief interest of the parties that day centered on the proposition of associating themselves together for the purpose of securing contracts from the government to do engineering and architectural work, and of course, if such contracts were secured, to perform them. As to performance, they dealt in generalities. Mention was made of a division of the fees, but nothing was said about division of the work. It is evident that had the conversation of December 20, 1941, been the only one between the parties it would have lacked the definiteness and completeness necessary to bind defendant in the manner claimed by plaintiffs, as we will point out in detail later.

The parties held a second conference on December 24, 1941. At that time they had been awarded the Rapid City contract and had been informed that instead of its being a ten-million dollar project it would amount to one million dollars only. On that day they met with certain army officers to talk over the Rapid City job. Conversations as to the arrangement between themselves took place

while they were waiting for the army officers to appear and after they had left. At that meeting Milinowski said:

"* * * at least that the proposition of banding together for work was mentioned. It was mentioned, I think, as I remember it, more or less in general banded [sic] about conversation casually or while we were waiting for the army officers to appear." He said he could not give the words that any particular person used. "It was a matter of general conversation, just as among friends who had put through something they had been hoping to do; * * *."

Estabrook said of this second conference:

"Well, Mr. Druar * * * said * * * we had better get the most that we could for this group. That was in general the basis of Mr. Druar's talk; and Mr. Druar again, as was his custom, asked each of us specifically if we thought that was a good idea and agreed to it.

"Q. That what was a good idea?

"A. That we go out after this work and particularly the jobs which we had listed, and all the group said 'Yes,' they thought it was a good idea, and that there wouldn't be any more municipal work, the work that we had been accustomed to doing, until the war was over, that came out."

On cross-examination he said:

"* * * Mr. Druar's nearest wish was about the getting, soliciting, and obtaining of work; that seemed to be what his part of the discussion mostly took in." The Rapid City job was also talked over.

Hitchcock testified that at the meeting of December 24 there was nothing specifically said other than that mentioned as being said at the previous meeting. He said Ellerbe asked if the group was still of a mind to proceed with the work (the Rapid City job) in view of the fact that it had been materially cut down in size. It was of interest to Hitchcock and Estabrook, as they were at that time employed at the Twin City Ordnance Plant at New Brighton. They (Hitchcock and Estabrook) finally said that they would pro-

ceed with the Rapid City job; that while it was not a large job it would establish them with the contract authorities and they would be in a much better position to obtain other work. It was agreed, however, that Hitchcock would continue work at New Brighton.

Druar testified as to this second meeting that after the army officers had left and they knew they had the Rapid City job "in the bag" if they wanted it he said:

"* * * I again asked the question and said that we had this opportunity and wanted to know if they were all willing to go ahead with it, and I personally asked each one of them if they would agree to continue for the duration of this work inasmuch as we had gotten—well, as Mr. Ellerbe expressed it—'Our foot in the door,'—*we were willing to proceed along the same lines* and carry out any work which was tendered us by the government which we could perform, and I again put the question to them.

"Q. What question?

"A. Of whether we were to still proceed to come together, as you might say—coadventurers in the carrying out of federal work and divide the fees in accordance with one-third to each one and in accordance with the work that we would do as it came up. That is, in other words, *the government might tender us some particular piece of work that might not be suited to all of us* and perhaps there might be a different division of work along those lines." He testified that Ellerbe gave his assent that they "go ahead and continue on our adventure, copartnership, you might say, of our three associates * * * [to] provide architectural and engineering plans and specifications and supervision of construction as required by the government."

It is obvious from the above detailed recital of the conversation of December 24 that nothing material as to the general arrangement was added to what was said at the conference on December 20, and our characterization of the legal effect of that first meeting applies equally to the second one.

At this second conference, it was agreed that Ellerbe should go to Washington and execute the necessary contracts. This was

done. Upon his return from Washington on January 2, 1942, a third conference was held. Milinowski, Estabrook, and Hitchcock gave no testimony as to what was said at that meeting relative to any understanding between themselves and Ellerbe as to the performance of government work. Druar alone testified along that line. He said:

"I was very much elated with his [Ellerbe's] advising we got this job. Now that starts us out in good shape. *Are you fellows all willing to continue under the same proposition?* You twice before told me that you would associate yourself with us in the securing and proceeding and dividing the profits of the work which we expect to get, and this is an entering wedge, *and we will proceed along the same lines,* and I am going to exert my very best efforts to carry this thing through successfully so we not only have this million-dollar contract, but many more million, having in mind some of the other plants which were coming up," and that Ellerbe said "Yes."

Again the testimony as to the conversation at the third conference discloses no plan as to how the contracts were to be financed or executed or how the work was to be apportioned. Druar simply said: "Are you fellows all willing to continue under the same proposition?" and stated: "* * * and we will proceed along the same lines."

Work was commenced on the Rapid City job on January 2, 1942, and finished in the early part of March that year. On or about April 12, 1942, defendant entered into a contract with the federal government to furnish architectural and engineering services in connection with the construction of a Bombardment Air Base at Great Falls, Montana. One George Shroepfer was named as a consultant. Plaintiffs knew nothing of this contract until some days later.

The question presented to us is whether the conversations of December 20, 1941, December 24, 1941, and January 2, 1942, are sufficiently definite to enable a court to say that they showed the intention and assent of the parties to enter into a contract of gen-

eral partnership, or rather a contract for a series of joint enterprises, and so complete that performance might be permitted without further agreement among them. If further agreement was necessary, the court cannot supply the omission and make their contract for them.

It is evident from other evidence in the case that the parties themselves considered the oral arrangement incomplete and insufficient. At the meeting of December 24, even before their contract with the government covering the Rapid City job had been signed, all the parties agreed that an attorney be employed to draw up a contract to be signed by all of them setting out their agreement as to the performance of that particular job. This contract was carefully drawn by an attorney suggested by Milinowski and signed on January 13, 1942. It provided that all parties should devote their best efforts and such time as might be necessary to perform the work, except that Hitchcock would not be required to discontinue his work at the ordnance plant. It provided that the manner of performing the work and the division of labor among the parties should be the subject of further agreement among them; that all fees be divided equally; that all plans should bear the names of all the parties; that the parties be reimbursed for their expenditures; and that no commitment or expenditure which was not reimbursable under the contract with the government should be made without the prior consent of all parties. Nothing is said in that contract about any general agreement such as is claimed in these actions.

The conversations did not cover the division of work among the parties as respects any job obtained. Estabrook was asked:

"And there were various things necessary to clear up to go ahead with that work among your group?

"A. Well, it is necessary to divide up who would do which part of the work.

\*   \*   \*   \*   \*

"Q. But the division of the work, the part that was to be performed by each, is a very essential point in any enterprise in doing this kind of work?

"A. It is.

"Q. And in an arrangement such as your group of three different firms that you have described, that matter of dividing the work on any job between you and of determining how that work should be performed is about the most important thing you have to do, isn't it?

"A. Yes.

"Q. And until you agree on that you can't go ahead on any job, is that right?

"A. Well, that agreement was for Rapid City only.

"Q. That is right, that is what I know, but until you all agree on that among yourselves you couldn't go ahead and do anything, is that right?

"A. That is right."

Hitchcock testified that if the government had tendered a job consisting entirely of the designing of electrical construction they would probably have to get together and decide how to do it, how it was going to be handled. It was not discussed at the meetings.

"Q. Nor was there discussed at your meetings at all any method of deciding how any work would be divided among you?

"A. There would be no point in it."

And Druar stated:

"* * * the government might tender us some particular piece of work that might not be suited to all of us, and perhaps there might be a different division of work along those lines." He also stated that the fees would be divided "in accordance with the work that we would do as it came up."

Neither did the conversations cover the financing of the enterprises nor the contributions of the parties to the necessary capital.

There are further indications from the evidence that the parties themselves did not consider that a general binding contract had

been entered into by these conversations. When it was disclosed at the meeting of December 24 that the Rapid City contract with the government would amount to only a million dollars instead of ten million dollars, as they had expected, it raised a question whether Estabrook and Hitchcock would "go in on it at all or not." They finally decided to go along, but Hitchcock was to continue his work at the ordnance plant. Also, about February 12 and while the Rapid City work was in progress, Estabrook and Hitchcock joined an organization known as Allied Architects and Engineers of Minneapolis, whose object was to get government work and who actively solicited such work. They raised a fund to finance solicitation of government work for that membership and started to incorporate. Hitchcock & Estabrook, Inc. claim here that defendant is bound by an alleged oral contract, while it is apparent from the evidence that the officers of that corporation did not consider themselves bound by the same contract.

It is significant that none of the plaintiffs ever made a demand upon defendant to participate in the performance of the Great Falls job, although they were informed almost immediately that it had been awarded that contract. It is apparent that at that time plaintiffs did not consider that the conversations had bound defendant. Nothing was said by plaintiffs to defendant about the Great Falls job until it was completed. About April 20, 1942, Milinowski wrote the War Contract Board that he and Druar were associated with the firm of P. C. Bettenburg, in search of government work, and that they wished to do such work jointly.

Druar testified that at the meeting of December 24 he asked each one if he was *"willing to proceed along the same lines* and carry out any work which was tendered us by the government * * *."* He also testified that at the meeting of January 2 he asked the question: *"Are you fellows all willing to continue under the same proposition?"* and that he stated: *"* * * we will proceed along the same lines * * *."* He said that all agreed. Proceeding "along the same lines" would necessarily include the entering into a writ-

ten contract by the parties as to each job, as was done in connection with the Rapid City project.

We are of the opinion that because of their incompleteness, indefiniteness, and uncertainty as to essential terms the conversations testified to were insufficient to constitute a valid contract; that the arrangement between the parties contemplated that an agreement would be entered into as to each venture which they would undertake; and that such agreement would determine and govern the rights, duties, and obligations of the several entities therein.

There was nothing in the conversations as to division of work. The three firms had previously engaged in different fields of work. There was nothing in the conversations as to what would be done if the work was unsuitable to one or more of the firms, nothing as to how the projects were to be financed, and nothing as to how to divide the fees in accordance with the work. The omissions are so material that the court cannot say what the obligations between these parties are.

■ It was stated by this court in Ames-Brooks Co. v. Aetna Ins. Co. 83 Minn. 346, 349, 86 N. W. 344, 345:

"* * * If an alleged contract is so uncertain as to any of its essential terms that it cannot be carried into effect without new and additional stipulations between the parties, it is not a valid agreement."

In Anderson v. Backlund, 159 Minn. 423, 425, 199 N. W. 90, 91, this court said:

"* * * There is a lack of mutual assent to the same proposition, and the language is entirely too indefinite and general as to the usual elements of a contract. The minds of the parties never met upon the essential terms. Contracts must be certain in terms and not so indefinite and illusory as to make it impossible to say just what is promised. The proof in this respect is insufficient."

And in Gruesner v. Thatcher, 158 Minn. 470, 471, 197 N. W. 968, 969, the court said:

"* * * The portion of the agreement above quoted is no expression of contractual assent. That it is fatally incomplete and indefinite as to substantial and necessary terms is too clear for discussion. It does not express agreement. On the contrary, it expresses a failure to agree. In such a case the law cannot finish what the parties have left unfinished and thereby create a contract where they intentionally omitted to make one for themselves."

Plaintiffs question the rulings of the trial court in refusing to receive certain exhibits in evidence. There was a group of letters, exhibits G to U, inclusive, written by Druar and Milinowski to various persons, which the court upon objection excluded. Their materiality depends upon their contents. These exhibits have been lost and are not before the court. In that situation, we cannot pass upon the questioned rulings. They also claim that the court erred in sustaining defendant's objection to the introduction of a letter to Druar from the chairman of the Construction Contract Board. The court ruled correctly, as the exhibit was hearsay and it impeached nothing testified to by Ellerbe, a witness for defendant and the witness whom plaintiffs claim the letter would impeach.

Order affirmed.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.