Lester J. LOHSE, Roy W. Lohse, Vernon Lohse, Ada Bagley, Ila Mae Gilbert, Loyal J. Lohse, and Esther Lohse, Plaintiffs and Appellants,

v.

ATLANTIC RICHFIELD COMPANY, Defendant and Appellee.

Civ. No. 11099.

Supreme Court of North Dakota.

June 9, 1986.

Pringle & Herigstad, Minot, for plaintiffs and appellants; argued by James E. Nostdahl.

Fleck, Mather, Strutz & Mayer, Bismarck, for defendant and appellee; argued by Jane Fleck Romanov.

ERICKSTAD, Chief Justice.

The plaintiffs, members of the Lohse family, appeal from a summary judgment dismissing their action against Atlantic Richfield Company (ARCO) for enforcement of an alleged oral agreement to lease approximately 4,000 mineral acres owned by the Lohses. We affirm.

The evidence, viewed in the light most favorable to the Lohse family [*e.g.*, *Gowin v. Hazen Memorial Hosp. Ass'n*, 349 N.W.2d 4, 8 (N.D.1984)], indicates that during 1982, ARCO commenced an oil and gas leasing program in Williams and Divide counties. ARCO sent several landmen to the area, and each was assigned a different working area to secure leases. The landmen were authorized by ARCO to negotiate within specified limits the bonus, royalty, and primary term of the oil and gas leases. ARCO's landmen were generally offering a $200 per acre bonus, ⅛th to ³⁄₁₆ths royalty, and a three to five year primary term for the leases.

During the fall of 1982, Lester Lohse, acting on behalf of the Lohse family, contacted Kathy Schroeder, an ARCO landman, about the possibility of leasing the family's mineral acres. Lohse gave Schroeder land descriptions and Schroeder told Lohse she would forward them to Greg Yates, the landman responsible for leasing in the area where the family's acreage was located. During November 1982, Lohse met with Yates at a Williston hotel. According to Lohse, the meeting took place in the hotel lobby and lasted "not over ten minutes." Their conversation is described by Lohse in his deposition testimony:

"[By Mr. Lohse] A. ... I introduced myself, he introduced himself. And he said 'I'm leasing for Atlantic Richfield in Williams County and I'm leasing up in the Rock Island Township area, and,' he said, 'we are paying $200 an acre.' He volunteered this. I didn't ask him.

\* \* \* \* \* \*

"A. And he said, 'We are paying $200 an acre, three-year lease, three-sixteenths royalty.' And I said, 'That's a hell of a good lease. I'll take it.'

"[By Ms. Romanov] Q. At that time did you discuss your acreage, your lands?

"A. Yes, I told him approximately the number of acres that we were talking about.

"Q. And how many acres was that?

"A. I said, 'It's approximately 4,000 acres.'

\* \* \* \* \* \*

"A. ... And I said to him, 'Most of this land is in Rock Island, but some of it is in the township adjoining it, Ellisville, there's a little in Big Stone and there's 720 acres in Dublin.'

"Q. Did you discuss what sections in what townships?

"A. We just discussed the townships. And he said, 'That's fine. That's fine.' ... He said, 'We'll take that. And,' he said, 'if you have any friends and neighbors, tell them that I'm interested and I'll take theirs too.'

"Q. So did you provide Mr. Yates with any kind of map or plat of your lands?

"A. I asked him if—at the time if he had the papers that Kathy Schroeder brought to Denver and he said he had, but he also asked me to send him some more, which I did. So he was quite familiar with the land that I was talking about as far as leasing.

\* \* \* \* \* \*

"Q. What other—what else did you discuss besides the term, royalty and bonus?

\* \* \* \* \* \*

"A. We discussed the length of time to get a contract, the checks before the end of the year. The reason being, we

were talking about approximately $800,-000 in lease money. And I said to Mr. Yates, 'Would it be possible to get these contracts done so that half of the money could be taken in '82 before the first of the year, the other half taken after January 1?' And he said, 'Yes, that's possible.'

\*   \*   \*   \*   \*   \*

"Q. Did you discuss anything else besides deferring the bonus and getting leases to sign prior to the end of the year with Mr. Yates at that time?

"A. No, I don't believe so. He told me the area he was leasing in and he told me what they paid and the conditions. I told him the townships where the land was located and approximately 4,000 acres that was (sic) open for lease."

According to Lohse, Yates said he would forward ARCO's lease forms when he verified title to the minerals. Lohse claims that following his meeting with Yates, he received offers from other landmen and lease brokers to lease the mineral acres, but he turned them down. According to Lohse, the other offers ranged from $100 to $175 per acre bonus.

After several weeks had passed without receiving ARCO's lease forms, Lohse made a number of phone calls to Yates at ARCO's Denver office. According to Lohse, Yates would tell him either that the leases had been drafted and would be forwarded to him as soon as they were ready, or that the leases were already in the mail. Lohse never received the leases and in March 1983, he visited ARCO's Denver office. Yates was not in the office at the time and another landman told Lohse that he would investigate the matter. Shortly after the visit, ARCO informed Lohse that Yates was no longer employed by the company and that ARCO was not interested in leasing the Lohse family minerals. In the meantime, the demand for oil and gas leases in the area had declined, and Lohse was unable to lease the minerals.

The Lohse family brought this action seeking "enforcement of [ARCO's] agreement to lease by payment of the bonus amount of $780,000," and, in the alternative, "damages in the amount of $780,000 for [the Lohses'] losses." The Lohses also sought exemplary damages in excess of $780,000. The Lohses alleged fraud and claimed ARCO was estopped from denying the validity of the alleged oral agreement. ARCO defended on the grounds that no legally enforceable agreement existed between the parties, that Yates had no authority to lease the minerals, and that enforcement of the alleged oral agreement was barred by the statute of frauds. The district court granted ARCO's motion for summary judgment and this appeal followed.

█ It is undisputed that oil, gas, and mineral leases constitute conveyances of interests in real property, and as such, are subject to the provisions of the statute of frauds, § 9–06–04, N.D.C.C. *See Petroleum Exchange v. Poynter*, 64 N.W.2d 718, 722 (N.D.1954). There is no written documentation of the alleged oral lease agreement in this case, and thus, the statute of frauds would normally operate to render the purported agreement invalid. The Lohses, however, assert that ARCO is barred from raising the statute of frauds defense because of its allegedly fraudulent failure to reduce the lease to writing, and because the elements of promissory and equitable estoppel are present.

The Lohses' claim of fraud is premised on the provisions of § 9–06–03, N.D.C.C., which provides:

"9–06–03. *Written contract prevented by fraud—Oral contract enforceable.* —When a contract which is required by law to be in writing is prevented from being put into writing by the fraud of a party thereto, any other party who by such fraud is led to believe that it is in writing and acts upon such belief to his prejudice may enforce it against the fraudulent party."

The Lohses assert that the elements of this statute have been satisfied because Yates assured Lohse that the leases had been drafted and mailed, and because Lohse rejected other lease offers in reliance on ARCO's representations.

■ In order to invoke the provisions of § 9–06–03, N.D.C.C., one must, under the express terms of the statute, first establish the existence of an oral "contract." A contract, be it oral or written, "requires an offer, and acceptance of that offer, and mutual acceptance and understanding of the offeror and offeree as to the terms of the legally enforceable obligation thus incurred." *Cargill, Inc. v. Kavanaugh,* 228 N.W.2d 133, 138 (N.D.1975). In *Mag Construction Company v. McLean County,* 181 N.W.2d 718, 721 (N.D.1970), this court stated:

"To be valid and enforceable, however, a contract must be reasonably definite and certain in its terms so that a court may require it to be performed. *Morey v. Hoffman,* 12 Ill.2d 125, 145 N.E.2d 644 (1957). It must spell out the obligations of each of the parties with reasonable definiteness. Indefiniteness as to any essential element of the agreement may prevent the creation of an enforceable contract. *Hansen v. Snell,* 11 Utah 2d 64, 354 P.2d 1070 (1960). Thus contracts must be definite enough to enable a court to ascertain just what is required of the respective parties in the performance thereof. Courts will not uphold agreements which are indefinite and uncertain as to the obligations imposed upon the parties thereto. *Richards v. Oliver,* 162 Cal.App.2d 548, 328 P.2d 544 (1958).

"Where an agreement is so uncertain and incomplete as to any of its essential terms that it cannot be carried into effect without new and additional stipulations between the parties, it will be held to be invalid. *Druar v. Ellerbe & Co.,* 222 Minn. 383, 24 N.W.2d 820 (1946).

"... Therefore, where one party to a contract retains the right to determine the extent of his performance, his promise has been held to be too indefinite for reasonable enforcement. *Knox v. Ffoulke,* Sup., 73 N.Y.S.2d 650 (1947)."

ARCO asserts that the oral lease agreement between Lohse and Yates was not sufficiently certain and complete as to its essential terms to constitute an enforceable contract because the only terms agreed upon were the royalty, bonus, and primary term. ARCO contends that other essential terms, such as deferred bonus payments, the matter of a Pugh clause, pooling and unitization powers, surface damage, and delay rental payments, remained for further negotiation. The Lohses assert that the "missing" terms of the agreement can be supplied by reference to Chapters 38–11 and 38–08, N.D.C.C., and to ARCO's "standard lease form."

The "essential terms" of an oil and gas lease have been rather vaguely defined as " '... the term for which the lease was to run, the time for the beginning of drilling operations, the amount of royalty to be paid for oil, the amount of royalty to be paid for gas, and other essential provisions ...' " Maxwell, *Enforceability of Oral Agreements in Oil and Gas Transactions,* 7 Inst. on Oil & Gas L. & Tax'n 165, 173 (1956) [quoting *East v. Garcia,* 295 S.W. 239, 241 (Tex.Civ.App.1927) ]. A review of cases which involve the analogous situation of the sufficiency of a written memorandum to take an oil and gas lease out of the statute of frauds, however, demonstrates the high degree of precision and completeness required with regard to the terms of an oil and gas lease before a court will uphold its validity.

In *Grow v. Davis,* 110 Kan. 214, 203 P. 683 (1922), the court dismissed an action to compel performance of a contract to execute an oil and gas lease. The parties had entered into a written contract which stated in part that " 'Lease calls for one-eighth

of oil, $250 for gas well, $50 for gas from oil well, five-year term, $1.00 per acre rental.' " *Davis, supra,* 203 P. at 684. The agreement further specified that the form of lease to be executed was a " 'producer's 88.' " *Davis, supra,* 203 P. at 683. The court held that the agreement was unenforceable because of the parties' failure to reach an agreement as to the specifics of a delay rental clause. The court concluded that, notwithstanding the parties' agreement on other terms of the lease, because the "time limit within which a well should be commenced or rental begin was a subject of primary importance ... the lease could not be written without further negotiation respecting its terms, and so the contract was not binding." *Davis, supra,* 203 P. at 685.

In *Cantrell v. Garrard,* 240 S.W. 533 (Tex.Com.App.1922), the parties agreed to convey an oil and gas lease on twenty acres of land for $50,000 payable upon examination and approval of title. Although the land covered by the lease was adequately described, the only description of the terms of the lease was a recitation that " '[a] lease or an assignment of a lease is hereby proposed to be sold, what is known as a commercial lease, providing for one-eighth royalty to the landowner.' " *Cantrell, supra.* The court concluded that the contract was void for uncertainty because all of the essential elements, such as "[t]he term for which the lease was to run, the time for beginning drilling operations, the time and amount of payments in lieu of drilling operations, and the amount to be paid for gas produced," were not set forth in the agreement. *Cantrell, supra,* 240 S.W. at 534. Similar results were reached in *Paine v. Moore,* 464 S.W.2d 477 (Tex.Civ.App.1971); *Alexander v. Glasscock,* 271 S.W.2d 333 (Tex.Civ.App.1954); *Knox v. Rutherford,* 168 S.W.2d 313 (Tex.Civ.App.1943); and *Taber v. Pettus Oil & Refining Co.,* 139

Tex. 395, 162 S.W.2d 959 (Tex.Com.App. 1942). It is also clear that an agreement to enter into a "standardized" oil and gas lease form adds nothing to the definiteness or certainty of a lease agreement. As the court stated in *Fagg v. Texas Co.,* 57 S.W.2d 87, 89 (Tex.Com.App.1933):

"The particular character of the rights which were to be acquired by the proposed lessee, or the extent or duration of such rights, is not in any wise disclosed or made ascertainable. The provision relative to 'an 88 form lease' can shed no light on those matters, for the reason that the character of printed matter contained in any designated class of oil and gas lease forms depends on what matter various designers of such forms may deem appropriate—and may vary accordingly. As we see it, the reference to 'an 88 form lease' is as incapable of definite application as if the term 'oil and gas lease form' had been used instead."

*See also MacDonald v. Groneman,* 163 S.W.2d 265 (Tex.Civ.App.1942).

■ In the instant case, assuming for purposes of argument that the description of the property to be leased was sufficiently ascertainable, the only terms agreed upon between Lohse and Yates were the royalty, bonus, and primary term. In view of the complexity of the various rights and obligations of the parties to an oil and gas lease, we deem agreement as to these terms alone insufficient to constitute an enforceable oil and gas lease, and conclude that the "missing" essential terms cannot be provided by reference to statute or ARCO's "standard lease form." We conclude that, as a matter of law, the oral agreement between Lohse and Yates is too indefinite and uncertain to constitute a valid oil and gas lease.[1] Because no oral "contract" was formed between the parties, § 9–06–03, N.D.C.C., is inapplicable in this case.

---

1. The Lohses rely upon *Texas Co. v. Sloan,* 171 Kan. 182, 231 P.2d 255 (1951), in which the court held that a lessor was equitably estopped from claiming the protection of the statute of frauds in an action by the lessee for specific performance of an oral agreement to execute an oil and gas lease. However, the sufficiency of the oral agreement as a valid independent contract was not an issue in *Sloan.* We therefore find *Sloan* inapposite to this case.

The Lohses next assert that even if the agreement between Lohse and Yates is too indefinite to constitute an enforceable contract, their estoppel claims nevertheless remain viable. Assuming for purposes of argument that the doctrines of promissory and equitable estoppel may bar the assertion of the statute of frauds defense under § 9–06–04, N.D.C.C. [*compare Cooke v. Blood Systems, Inc.*, 320 N.W.2d 124 (N.D. 1982), *with O'Connell v. Entertainment Enterprises*, 317 N.W.2d 385 (N.D.1982)], we find neither doctrine applicable under the circumstances presented in this case.

■ The elements which must be established before the doctrine of promissory estoppel can be invoked are: 1) a promise which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action or forbearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise. *Russell v. Bank of Kirkwood Plaza*, 386 N.W.2d 892, 896 (N.D.1986). The Lohses assert that for purposes of an action based on promissory estoppel, the promise need not be as specific and definite as that required for a contract.

Although some courts have held that the promise giving rise to the application of promissory estoppel need not be so definite with respect to all details that a contract would result if the promise were supported by consideration, *see Janke Construction Co., Inc. v. Vulcan Materials Co.*, 386 F.Supp. 687, 693 (W.D.Wis.1974), *aff'd*, 527 F.2d 772 (7th Cir.1976) (applying Wisconsin law); *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo.1983); *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965), other courts have held that the promise or agreement must be clear, definite, and unambiguous as to essential terms. *See Neeley v. Bankers Trust Co. of Texas*, 757 F.2d 621, 630 n. 7 (5th Cir. 1985) (applying Texas law); *Jungmann v. St. Regis Paper Co.*, 682 F.2d 195, 197 (8th Cir.1982) (applying Iowa law); *Laks v. Coast Federal Savings & Loan Association*, 60 Cal.App.3d 885, 131 Cal.Rptr. 836, 839 (1976); *Matter of Estate of Graham*, 295 N.W.2d 414, 418–419 (Iowa 1980); *Keil v. Glacier Park, Inc.*, 188 Mont. 455, 614 P.2d 502, 506–507 (1980); *Weitzman v. Steinberg*, 638 S.W.2d 171, 176 (Tex.Civ. App.1982); *H. Molsen & Co., Inc. v. Hicks*, 550 S.W.2d 354, 356 (Tex.Civ.App.1977). The latter view evidences a reluctance to enforce incomplete agreements based upon preliminary negotiations and discussions or upon an agreement to negotiate the remaining terms of a contract in the future. *See Keil, supra; Weitzman, supra.*

■ We agree with those courts which require that the promise or agreement be clear, definite, and unambiguous as to essential terms before the doctrine of promissory estoppel may be invoked to enforce an agreement or to award damages for the breach thereof. *Cf. Cooke, supra*, 320 N.W.2d at 129, 130 (promissory estoppel inapplicable where facts and circumstances did not establish sufficient promise or agreement between the parties for lease of premises). Because the parties failed to agree to or even discuss many essential terms of the oil and gas lease, we conclude that the requirement of a certain and definite agreement or promise has not been satisfied in this case.

■ We likewise conclude that the doctrine of equitable estoppel cannot be used to create an enforceable agreement between the parties. Assuming for purposes of argument that the necessary elements for equitable estoppel are present in this case and that ARCO would thereby be estopped from raising the statute of frauds as a defense to the Lohses' action, we have concluded that no legally enforceable oral contract arose between the parties. Thus, the establishment of equitable estoppel would be of no avail to the Lohses. The purpose of equitable estoppel is to preserve rights already acquired and not to create new ones; equitable estoppel does not it-

self give rise to a cause of action. *See, e.g., Emery v. Brown Shoe Company*, 287 S.W.2d 761, 768 (Mo.1956); *Utschig v. McClone*, 16 Wis.2d 506, 114 N.W.2d 854, 855 (1962); 28 Am.Jur.2d *Estoppel and Waiver* § 33 (1966); Dobbs, Handbook on the Law of Remedies § 2.3 at p. 42 (1973).

Resolution of the factual disputes in this case would not change the legal result. Accordingly, we conclude that the district court did not err in granting ARCO's motion for summary judgment. *See Russell, supra.*

The summary judgment is affirmed.

VANDE WALLE and LEVINE, JJ., PEDERSON, Surrogate Justice, and GRAFF, District Judge, concur.

PEDERSON, Surrogate Justice, and GRAFF, District Judge, sitting in place of MESCHKE and GIERKE, JJ., disqualified.