Julie A. CLOOTEN, Plaintiff
and Appellee,

v.

Robert CLOOTEN, Defendant
and Appellant.

Civ. No. 930395.

Supreme Court of North Dakota.

Aug. 24, 1994.

Joseph J. Cichy (argued), of Wheeler Wolf, Bismarck, for plaintiff and appellee.

Irvin B. Nodland (argued), of Irvin B. Nodland, P.C., Bismarck, for defendant and appellant.

NEUMANN, Justice.

Robert Clooten appeals from an order denying his N.D.R.Civ.P. 60(b) motion to vacate a judgment which granted Julie A. Clooten a divorce from him and distributed their marital property in accordance with the parties' stipulated property settlement agreement. We affirm.

Robert and Julie were married in 1974 and had a daughter, Sarah Jane, in 1979. In 1978, Julie, her father, James Mohler, and Robert were the three original incorporators of Fertilawn, Inc. Mohler provided the capital for the corporation and all of the stock was placed in his name for security purposes. Robert, who had a bachelor of science degree in mathematics, worked for the lawn care company. In the beginning, Mohler's wife kept the books for Fertilawn. As the company grew, more employees were hired and Julie, upon completing her college degree, began keeping the books for the company. Over the years, Mohler put additional money into the corporation and took additional security. Robert and Julie remained salaried employees who would periodically receive bonuses. Mohler eventually transferred part of Fertilawn's stock into Julie's name as a gift. On January 1, 1991, Mohler sold all of his remaining stock to Fertilawn for $120,000 through a stock redemption agreement. Mohler received $20,000 immediately, with

the corporation paying Mohler the remainder by $1,808.86 monthly payments for a period of six years. Julie thus became the owner of Fertilawn, subject to the debt to Mohler.

By January 1993, the parties' marriage had deteriorated and they agreed to a divorce. According to Julie, during the two-week period following their decision, she and Robert amicably discussed settlement issues every day, including the distribution of their property. They eventually reached an agreement.

The parties met with Julie's attorney twice at his office. At the first meeting on February 1, 1993, Robert was shown draft documents of their agreement and was informed that if he had any questions concerning the divorce or the property settlement agreement, he should consult with an attorney of his own choosing. The agreement had been prepared based on what the parties had previously discussed and agreed upon. The only unresolved issue was the amount of child support Robert would pay for Sarah's care, and this was resolved after the attorney consulted the child support guidelines. The property settlement agreement itself also provided that Robert had a right to have the documents reviewed by an attorney and that Julie's attorney was not representing Robert's interests. Robert did not seek the advice of another attorney.

On February 3, 1993, Robert and Julie returned to the attorney's office and signed the settlement agreement. A divorce judgment incorporating the provisions of the agreement was entered on February 10, 1993. The divorce judgment granted Julie custody of Sarah and ordered Robert to pay child support. Concerning division of property, Julie received the parties' home and the Fertilawn stock. She was also responsible for all marital debt, including two existing mortgages on the home. Robert received a 1988 Jeep Wagoneer, a hot tub, and $25,000 in cash payable by Julie on the date of entry of judgment. Various items of personal property were divided between the parties and were not specifically mentioned in the agreement. Neither party was ordered to pay spousal support.

Robert continued his employment at Fertilawn after the divorce. But approximately five months afterward, Robert moved to have the divorce judgment set aside under N.D.R.Civ.P. 60(b). He also served notice that he was rescinding the parties' property settlement agreement "on the grounds of mistake, excusable neglect, misrepresentation, and fraud...." After Robert's motion, Julie terminated his employment at Fertilawn.

Following a hearing, the trial court denied Robert's motion, determining that Robert had failed to establish sufficient grounds to vacate the divorce judgment. Robert appealed.

In reviewing a trial court's denial of a motion to set aside a regularly entered judgment under N.D.R.Civ.P. 60(b), we do not determine if the trial court was substantively correct in entering the judgment from which relief is sought, but determine if the trial court abused its discretion in ruling that sufficient grounds for disturbing the finality of the judgment were not established. *Wolfe v. Wolfe*, 391 N.W.2d 617, 620 (N.D.1986); *Fleck v. Fleck*, 337 N.W.2d 786, 789 (N.D. 1983). A trial court abuses its discretion when its decision is not the product of a rational mental process by which the facts and law relied on are stated and considered together for the purpose of achieving a reasoned and reasonable determination. *Oliver v. Braaten*, 518 N.W.2d 673, 678 (N.D.1994). Where the judgment sought to be set aside has been entered pursuant to a contractual stipulation, the party challenging the judgment on Rule 60(b) grounds has the additional burden of showing that, under the law of contracts, there is justification for setting the contract aside. *Wolfe, supra; Fleck, supra*, 337 N.W.2d at 790. As we said in *Stoelting v. Stoelting*, 412 N.W.2d 861, 864 (N.D.1987), "[a] party cannot reopen a judgment merely because he is unhappy with it; he must show justification for the mistake or inadvertence. Ignorance of the law is not normally enough."

Under the circumstances, we cannot say that the trial court abused its discretion in refusing to grant Robert Rule 60(b) relief.

In *Wolfe, supra,* 391 N.W.2d at 619, we said:

"The public policy of this state favors the prompt and peaceful resolution of disputes in divorce matters. *See Fleck v. Fleck,* 337 N.W.2d 786, 792 (N.D.1983); *Peterson v. Peterson,* 313 N.W.2d 743, 745 (N.D.1981); *Galloway v. Galloway,* 281 N.W.2d 804, 807 (N.D.1979). In recognition of this public policy and the right of a husband and wife to contract with each other, we held in *Peterson, supra,* that a court's authority to make a just and equitable distribution of property under § 14–05–24, N.D.C.C., does not allow the court to rewrite a valid written separation agreement absent statutory grounds for rescission under Chapter 9–09, N.D.C.C. Thus, to the extent that competent parties have voluntarily stipulated to a particular disposition of their marital property, a court ordinarily should not decree a distribution of property that is inconsistent with the parties' contract. *Peterson, supra,* 313 N.W.2d at 744."

This court was faced with analogous circumstances in *Fleck* and *Wolfe.* In *Fleck,* the husband, a trucker, sought a divorce from his wife of 31 years, who was employed in a hospital laundry department. The husband contacted a lawyer to start the divorce action and asked that he send a proposed property settlement agreement to his wife. The lawyer did so and sent a letter informing the wife she should examine the agreement and if it was in accordance with their wishes, to make an appointment so the agreement could be signed. The letter also informed the wife she could take the agreement to any attorney of her choice, but she did not seek the advice of another attorney and signed the agreement, which was incorporated into the divorce judgment.

After the wife remarried, an act which invoked a stipulated provision concerning disposition of the marital home, she sought Rule 60(b) relief from the divorce judgment. The wife alleged among other things that she had only been educated through the seventh grade, had no understanding of what her legal rights were regarding the property settlement, did not understand the terminology in the agreement, and did not know the value of the marital property. We upheld the trial court's refusal to grant relief, concluding, "that a party is not represented by counsel at the time he or she enters into a written stipulation dividing the property of the marriage, in and of itself, is not sufficient justification for relief...." *Fleck, supra,* 337 N.W.2d at 790. The wife's seventh grade education, we said, was "clearly insufficient to establish her as incompetent to deal with her affairs at the time she entered into the property settlement agreement," and, having been informed of her right to consult with an attorney of her choice, we would not relieve her of the "free, calculated, and deliberate choices" she had made. *Fleck, supra,* 337 N.W.2d at 790, 791.

Likewise, in *Wolfe,* the husband, a railroad employee, and wife, who had not been employed outside of the home for several years, decided to end their 32 year marriage. The wife contacted an attorney who drafted a property settlement agreement. The husband signed the agreement without consulting with another attorney. In the document, the husband acknowledged that he had ample opportunity to consult legal counsel, that he possessed adequate information on all aspects of the agreement, that he entered it freely and voluntarily, and that no undue influence or duress had been exercised upon him. Relying on *Fleck,* we held that the trial court had no duty to investigate the terms of the agreement to determine if it was objectively "fair and equitable," and concluded that the trial court did not err in accepting the settlement agreement and incorporating it into the divorce judgment. *Wolfe, supra,* 391 N.W.2d at 620.

■ Robert asserts that *Fleck* and *Wolfe* are distinguishable. Unlike those cases, he argues, a conflict of interest exists here because Julie's attorney had "been both parties' lawyer for many years in the past." According to Robert, his relationship with Julie's attorney "was always one of friendship and trust," and "[a]n attorney who has represented a husband and a wife in their personal and business affairs for many years cannot one day choose sides and represent one against the other." While perhaps legally sound,

Robert's argument is not supported by the facts.

Rule 1.9 of the North Dakota Rules of Professional Conduct prohibits a lawyer who has formerly represented a client in a matter from representing another person in the same matter in which that person's interests are materially adverse to the interests of the former client; from representing another person in a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or from using information relating to the representation to the disadvantage of the former client in the same or a substantially related matter. *See also* N.D.R.P.C. 1.7. But Robert exaggerates the extent of Julie's attorney's past representation. Robert never owned any Fertilawn stock and, according to Julie's attorney, the only prior legal work he performed for the corporation was redrafting the stock redemption agreement which had been originally prepared by Mohler's attorney. According to Julie's attorney, the only personal legal work he performed for them prior to the divorce was preparing wills for both Julie and Robert at Julie's request before the couple left on a trip so that a guardian and conservator would be established for Sarah in the event of their deaths. The record does not support Robert's claim of a longstanding legal relationship with Julie's attorney.

Moreover, the cases relied on by Robert which disapprove this practice in the area of family law involved contested divorce proceedings in which one spouse's attorney had acquired confidential information that could affect the matter in controversy. *See Woods v. Superior Court of Tulare County,* 149 Cal.App.3d 931, 197 Cal.Rptr. 185 (1983); *Cleland v. Cleland,* 35 Conn.Supp. 215, 404 A.2d 905 (1979); *Grover v. Virdi,* 130 A.D.2d 710, 516 N.Y.S.2d 27 (1987); *Forbush v. Forbush,* 107 A.D.2d 375, 485 N.Y.S.2d 898 (1985); *Carimati v. Carimati,* 94 A.D.2d 659, 462 N.Y.S.2d 220 (1983); *In Re McCaffrey,* 275 Or. 23, 549 P.2d 666 (1976). Here, the property settlement was not a contested matter. Robert and Julie had agreed on the disposition of property before visiting her attorney's office.

■ While no technical violation of the Rules of Professional Conduct occurred here, we recognize that ethical dilemmas may invariably arise whenever only one attorney handles a divorce proceeding, even when the unrepresented spouse gives apparent consent to the situation. *See generally* 2 A. Lindey and L. Parley, *Lindey on Separation Agreements and Antenuptial Contracts,* Ch. 41 (1994), and cases cited therein; 2 R. Mallen and J. Smith, *Legal Malpractice* §§ 22.5 and 22.6 (3rd ed. 1989), and cases cited therein. But the lack of legal representation of one of the parties to a marital settlement agreement is just one factor for the court to consider and weigh when claims of fraud, undue influence, or other actionable misconduct are made by the spouse challenging the agreement. *See Wolfe, supra; Fleck, supra; see also Tenneboe v. Tenneboe,* 558 So.2d 470, 473 (Fla.Ct.App.1990). The circumstances of the representation here do not mandate vacation of the divorce judgment.

■ Robert's argument also suggests that Julie engaged in overreaching. In *Charlson v. Charlson,* 50 N.D. 677, 197 N.W. 778, 781 (1924), this court said that "the marriage 'relation of husband and wife is one of special confidence and trust, requiring the utmost good faith, and equity closely and rigidly scrutinizes transactions between them to the end that injustice and oppression may not result.'" [quoting *Charlson v. Charlson,* 48 N.D. 851, 187 N.W. 418, 419 (1922)]. One court has noted that whether this confidential, fiduciary relationship survives an announcement of an intention to seek a divorce necessarily depends on the circumstances of each case. *See Williams v. Waldman,* 108 Nev. 466, 836 P.2d 614, 618 n. 4 (1992). Even considering that this fiduciary relationship arises not only from the marriage itself, but from Robert and Julie's involvement in the family business, *see generally Queenan v. Queenan,* 492 So.2d 902, 912 (La.Ct.App. 1986) ("whether under the theory of laws of partnerships, co-ownership of property, corporate law, or ... other applicable law, there is a fiduciary relationship existent until the properties and assets of a community regime

have been divided and accounted for between the former spouses."); *Retzer v. Retzer,* 578 So.2d 580, 594 (Miss.1990) (in divorce action where husband was majority shareholder in close corporation in which wife was only other shareholder, husband had fiduciary obligation to wife in management of her property and trustee's duty to preserve, protect and produce income from her corporate shares), and accepting for the sake of argument that this relationship survived the announcement of an intention to seek a divorce, we find nothing in the record to suggest that Julie breached any fiduciary duty.

Robert testified that he signed the agreement voluntarily, without coercion or undue influence, and that he thought the agreement was fair at the time he signed it. Robert has acknowledged that he had access to all of the personal and financial records of the parties and that nothing was withheld from him during divorce negotiations. Although Robert now claims the Fertilawn business is worth much more than he realized at the time, his testimony suggests that he took a keen interest in the business' financial condition throughout his employment there. Robert testified that he "always kept a record of Fertilawn as far as income for the season, for the year. Basically, it was like we would probably discuss it in December if we made a profit for the season." At the time the parties negotiated the property settlement, Robert was in as good a position as Julie to assess Fertilawn's worth.

■ Robert asserts that he should be entitled to rescind the property settlement agreement because the parties were operating under either a unilateral or mutual mistake of law. A party to a contract may rescind on the ground of mistake of law only when it arises from "[a] misapprehension of the law by all parties, all supposing that they knew and understood it and all making substantially the same mistake as to the law," or from "[a] misapprehension of the law by one party of which the others are aware at the time of contracting, but which they do not rectify." N.D.C.C. § 9–03–14. *See also* N.D.C.C. § 9–09–02(1). According to Robert, he, and perhaps Julie, were laboring under the false impression that, because the

stock was held in Julie's name alone, it could not become part of the marital estate for distribution upon their divorce. *Compare Heley v. Heley,* 506 N.W.2d 715, 718 (N.D. 1993) (trial court must consider all real and personal property accumulated by the parties as part of marital estate, regardless of the source). Robert testified that, because the stock was issued in Julie's name, "that disqualified me from any ... sharing of the stock...." Julie's testimony is somewhat inconsistent on her concept of the marital estate. However, Julie did testify that she offered Robert stock in Fertilawn, but that Robert instead chose the cash settlement. Robert acknowledged that Julie had discussed with him taking stock in Fertilawn. This testimony does not support the argument that either party was laboring under a mistake of law. The trial court did not err in failing to find a mistake of law under these circumstances.

■ Robert also asserts that the property settlement agreement is incomplete. According to Robert, when Julie's attorney left the conference room to get a copy of the child support guidelines, Julie promised him that "we would work something out as far as Fertilawn was concerned after that conference...." The parties chose not to pursue the matter while at the attorney's office in order to reduce the legal fees incurred for the divorce. Julie testified that the conversation occurred, but that it was not related to the property settlement agreement, only to Robert's possible year-end bonus as an employee of Fertilawn.

We reject Robert's argument. The stipulation signed by Robert states that "[t]his agreement is the entire agreement between the parties ... and is intended as a complete and conclusive settlement of all marital rights and claims between the parties, and shall not be subject to modification by any court except as allowed by statute or upon the written agreement of both parties." Robert has a college degree and exhibited his familiarity with contracts through his work with Fertilawn. In any event, the promise to negotiate in the future and "work something out" is essentially an agreement to agree in the future, which lacks essential terms and is

insufficient to support an enforceable contract or to invoke the doctrine of promissory estoppel. *See, e.g., Union State Bank v. Woell,* 434 N.W.2d 712, 717 (N.D.1989); *Lohse v. Atlantic Richfield Co.,* 389 N.W.2d 352, 355–357 (N.D.1986).

■ Robert asserts that the trial court erred in denying admission of financial records he found and copied in Fertilawn's corporate offices after the divorce. According to Robert, these records would have documented the obvious success of Fertilawn and the great disparity in the parties' property division. The documents were excluded for lack of foundation. We find no abuse of discretion in the trial court's ruling. The person who prepared the records was not called to testify as to their authenticity and meaning and, in any event, Robert was allowed to give his opinion of the value of the business.

We conclude that the trial court did not abuse its discretion in refusing to grant Robert relief from the divorce judgment. We have considered the other contentions raised and they do not affect our decision.

The order is affirmed.

VANDE WALLE, C.J., and LEVINE, J., concur.

MESCHKE and SANDSTROM, JJ., concur in the result.